HARVEY DAVIS v. THE STATE.

No. 3765. Decided November 17, 1915.

Rehearing denied December 22, 1915.

**1.—Murder—Conspiracy—Independent Design—Motive—Principals.**

Where, upon trial of murder, the defendant with others entered into an agreement to whip and whitecap negroes in the neighborhood, and started out together with a rifle and shotgun, veiling their faces with mosquito bar to prevent detection, in the night-time, and visited different negro houses and a negro schoolhouse where negroes were assembled and recklessly shot into said houses, whipping and abusing various negroes, and finally, about midnight, went to a negro's house to whip him and finding the door closed surrounded the house, defendant forcing the door open, and two of his co-defendants entered the house and one of them shot and killed the wife of said negro while she was sitting in bed defenseless in her night clothes, and not offering any resistance except telling them to leave the house; the appellant was a principal and guilty of murder, and his contention that the killing of said woman was not within the original design of the parties, although defendant was present aiding and encouraging his co-defendants in the different lawless acts, is untenable. Following Gonzales v. State, 74 Texas Crim. Rep., 458, and other cases. Davidson, Judge, dissenting.

**2.—Same—Rule Stated—Principals—Conspiracy.**

A person may be guilty of a wrong which he did not specifically intend, if it came naturally, or even accidentally, from some other specific general evil purpose. When, therefore, persons combine to do an unlawful thing, if the act of one proceeding, according to the common plan, terminates in a criminal result, though not the particular result meant, all are liable.

**3.—Same—Case Stated—Conspiracy—Principals—Intent.**

Where, upon trial of murder, the evidence showed that the defendant took with him on the night of the murder a shotgun, and one of his co-defendants a rifle, and the two with others agreed to go on a whitecapping expedition for the purpose of abusing and whipping negroes, and did recklessly shoot into negro houses and whip and abuse negroes therein, this evidenced that they contemplated that it might become necessary to use the rifle and shotgun, and when they did use the same and killed a defenseless negress they were all guilty as principals in the murder of said negress, although defendant did not fire the fatal shot, but was present aiding and encouraging his co-defendants in the various unlawful acts. Following Serrato v. State, 74 Texas Crim. Rep., 413. Davidson, Judge, dissenting.

**4.—Same — Evidence — Conspiracy — Acts and Declarations of Co-conspirators.**

Where, upon trial of murder, defendant with others agreed to enter upon a whitecapping expedition and did enter thereon and fire into the houses of various negroes in the neighborhood in the night-time, in reckless disregard as to whom they might kill, and finally wound up about midnight in breaking into a negro house and killing the wife of a negro who they intended to whip and whitecap, there was no error in admitting all the testimony about whipping other negroes and visiting other negro houses for such purpose and what was said and done by any of the parties engaged therein, and it was not necessary that a conspiracy must be first shown before the acts and declarations of the co-conspirators were admissible against the defendant, the whole evidence showing that a conspiracy actually existed at the time. Following Smith v. State, 21 Texas Crim. App., 107, and other cases.

**5.—Same—Rule Stated—Exploded Doctrine—Conspiracy.**

The ancient doctrine that a conspiracy must first be established ipso facto before proof of acts and declarations of the individual conspirators are ad-

missible against each other is now exploded, and where the whole evidence introduced on trial, taken together, shows that a conspiracy actually existed, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations. Following Cox v. State, 8 Texas Crim. App., 254, and other cases.

### 6.—Same—Independent Impulse—Charge of Court.

Where, upon trial of murder, the evidence showed that while the defendant did not actually kill deceased, but was present aiding and encouraging his co-defendants in an unlawful act to whitecap, whip and abuse the husband of deceased, and was with them recklessly using firearms in disregard of human life, his contention that the deceased was killed upon the independent impulse of one of his co-defendants, and that he was not liable as a principal, is untenable; besides, the court properly submitted a charge on the law of principals, and further instructed the jury that if defendant did not act as such principal, or if the jury had a reasonable doubt to acquit him, and there was no reversible error.

### 7.—Same—Burden of Proof—Charge of Court—Principals—Reasonable Doubt.

Where the defendant contended that the court's charge on principals shifted the burden of proof upon him to show that his co-defendants were guilty of the act and that he did not encourage or aid them therein, but the court's charge on principals fully applied the law to the facts of the case, and required the jury to find that defendant aided and encouraged his co-defendants, and in case of a reasonable doubt thereof to acquit him, such contention was untenable and there was no reversible error. Distinguishing Johnson v. State, 29 Texas Crim. App., 150. Following Powell v. State, 28 Texas Crim. App., 393, and other cases.

### 8.—Same—Corroboration—Charge of Court—Definition.

It is not necessary to define the word corroborate; its meaning is too well understood, and where, upon trial of murder, the charge of the court on accomplice's testimony was clothed in language frequently approved by this court, there was no reversible error.

### 9.—Same—Mistake—Accident—Charge of Court.

Where, upon trial of murder, the evidence showed that the defendant and others were on a whitecapping expedition, recklessly firing into the houses of negroes in the neighborhood in the night-time, and one of co-defendants shot and killed the wife of a negro whom they intended to whitecap, abuse and whip, and the circumstances showed that said co-defendant was probably shooting at the negro man and not at his wife, and there was evidence generally tending to show mistake or accident in the killing of the deceased, there was no error to submit a charge on this phase of the case.

### 10.—Same—Circumstantial Evidence—Charge of Court.

Where, upon trial of murder, there was direct and positive testimony as to which of defendant's co-defendants killed the deceased, and direct and positive testimony that the defendant was acting with the person who fired the fatal shot, there was no error in the court's failure to charge on circumstantial evidence.

### 11.—Same—Charge of Court—Requested Charges.

Where the requested charges were not applicable to the facts in the case, they were correctly refused, and where they were covered by the main charge in stating correct propositions of the law there was no error in refusing them.

Appeal from the District Court of Jasper. Tried below before the Hon. A. E. Davis.

Appeal from a conviction of murder; penalty, five years imprison-ment in the penitentiary.

The opinion states the case.

*J. T. Adams* and *Forse & Hamilton,* for appellant.—On question of court's charge on principals: Cunningham v. State, 27 Texas Crim. App., 479.

On question of independent impulse: Smith v. State, 52 Texas Crim. Rep., 27; Turner v. State, 20 Texas Crim. App., 68; Harris v. State, 15 id., 636.

On question of conspiracy: Blaine v. State, 18 S. W. Rep., 862; Renner v. State, 65 S. W. Rep., 1102.

Upon court's charge on accomplice's testimony: Jones v. State, 59 Texas Crim. Rep., 559.

Upon question that conspiracy must be established before admitting in evidence acts and declarations of alleged co-conspirators: Young v. State, 69 S. W. Rep., 153; Ripley v. State, 52 Texas Crim. Rep., 126.

On question of admitting declarations of co-defendant, as to the meaning that he had to have a negro: Myers v. State, 39 S. W. Rep., 111; Watson v. State, 52 Texas Crim. Rep., 551.

Upon question of other transactions: Barkman v. State, 52 S. W. Rep., 73; Smith v. State, 52 Texas Crim. Rep., 80; Hunt v. State, 60 S. W. Rep., 965.

*C. C. McDonald,* Assistant Attorney General, for the State.—Upon question of evidence upon conspiracy: Branch's Crim. Law, secs. 237, 239.

Upon question of acts and declarations of co-conspirators: Blaine v. State, 33 Texas Crim. Rep., 236; Baker v. State, 45 id., 392; Smith v. State, 48 id., 233; Branch's Crim. Law, secs. 240-245, and cases cited in opinion.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at five years confinement in the State penitentiary.

Tom Hughes testified that he, Walter Buckley and Dock Hughes, on the night of the homicide, ate supper at the home of the mother of Dock Hughes, and after supper all three of them got in a buggy and went to appellant's, Harvey Davis' home. That appellant joined them, riding his horse, and they went to the home of June Thomas for the purpose of whipping June Thomas; that Dock Hughes carried a rifle and appellant carried a shotgun. They all used a veil made of a mosquito bar to prevent detection. Not finding June Thomas at home, they went to the negro schoolhouse, where the negroes were assembled. That they carried a quart and a half of whisky with them and drank it up on their rounds that night. When they got near the negro schoolhouse they hitched the mule and horse, and he, Walter Buckley, and appellant went back to June Thomas' house. That while gone they heard some shooting, and when they returned found Dock Hughes near

the schoolhouse laughing. After this they shot into the schoolhouse and shot out the window lights. They then went back to the buggy, got a drink, all four got in the buggy and drove over to Clark's, near the schoolhouse, and appellant went in and whipped Clark with a mule whip. After this they shot into Clark's house three or four times, and then went on to Word Stepney's. Not finding Word Stepney, they all then went to the home of Jemes Parmer, and while there they made both Parmer and Elzie McCain get down on their knees and pray, and afterwards whipped Elzie McCain; that they went over to the home of Joe Kellum for the purpose of whipping Joe. Witness and Walter Buckley drove the buggy, and Dock Hughes and appellant walked, and while witness and Walter Buckley were tying the mule, appellant and Dock Hughes went to the door of Joe Kellum's house, and appellant called Joe several times. They placed witness at the end of the gallery and Walter Buckley at the back door. That appellant called Joe and told him to come out; his horse had gotten loose, and he wanted him, Joe, to help catch his horse. Getting no response, appellant and Dock Hughes motioned witness to come to them, and said appellant was to kick the door open, witness to strike a match, and he and Dock go in the house. That appellant kicked the door open, and witness and Dock went inside. That when they got inside, a woman was sitting on the bed in her night clothes, and he asked her for some matches, she replying they had no matches. He then asked for a lamp, and she told them they had no lamp, all this time Dock Hughes had his gun pointing in the direction of the woman. Witness says by the light of the match in his hand he saw a lamp and started to light it, the necessary inference being to hunt for Joe Kellum. As he started to light the lamp a gun fired (which was evidently fired by Joe Kellum) and Dock Hughes then shot three times, killing the woman.

One of the main contentions of appellant is that the killing of the woman was not within the design of the parties, and although he was present and kicked open the door for Dock and Tom Hughes to enter the house, he could not be guilty of the murder of the woman. If this is a sound proposition of law, of course, this would settle the case, but we do not think it sound. In the case of Gonzales v. State, 74 Texas Crim. Rep., 458, 171 S. W. Rep., 1146, and Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W. Rep., 1133, we had occasion to discuss the question here raised, and quoted approvingly the law as laid down by this court in Kirby v. State, 23 Texas Crim. App., 13, Judge White rendering the opinion:

"According to this statement or evidence it is clear that the parties had entered into an agreement and plan by which to effect their escape from jail, a part of which was as to the method by which Cannon was to secure and detain Glazner in the corridor. It is true that appellant says nothing about an understanding that Glazner was to be killed, or even that any bodily injury was to be inflicted upon him further than his confinement or imprisonment after he had entered the jail; but,

as part of the plan, and, doubtless, as considered by them, a most important part, they had procured and prepared for use the piece of iron with which the murder was committed, and appellant tells us that he himself, after it was prepared, hid the same under the water closet on the morning before it was used with such deadly effect by Cannon. If not to be used in any contingency, why prepare and hide such a weapon? Here we have established by the statement the conspiracy to effect the escape, and the preparation of a deadly instrument to be used, it may be, only if occasion required. True that at the very time it was used appellant and Brown were so situated that it was impossible they could afford Cannon any direct assistance, or, in fact, do more, perhaps, than encourage him by words and gestures, even if they did so encourage him, of which fact there is no positive proof.

"Under such circumstances, and without direct proof of encouragement, the question is, could appellant be held and considered in law a principal in the crime committed by Cannon? It is declared that 'all are principals who are guilty of acting together in the commission of an offense.' (Penal Code, art. 74) and 'all persons who shall engage in procuring aid, arms or means of any kind to assist in the commission of an offense whilst others are executing an unlawful act,' are principals. (Penal Code, art. 76.) And, again, any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act. (Penal Code, art. 78.)

"Thus it will be seen that, to render a party equally guilty and responsible with the real perpetrator, all that is required is that he be present, consenting, and that the act was the result of a common design. It is true his bare presence is not sufficient, nor is his failure to give alarm; neither is his inactive and supposed concealment of the offense. (Burrell v. State, 18 Texas, 713; Truitt v. State, 8 Texas Crim. App., 148; Tullis v. State, 41 Texas, 598; Ring v. State, 42 Texas, 282.) But such significant facts as his presence in connection with his companionship, his conduct at, before and after the commission of the act, are potent circumstances from which participancy may be inferred. (Id.) The true test is, did the parties act together, and was the act done in pursuance of a common design and purpose in which their minds had agreed? (Welsh v. State, 3 Texas Crim. App., 413; Wells v. State, 4 Texas Crim. App., 20; Scales v. State, 7 Texas Crim. App., 361; Corn v. State, 41 Texas, 301; Smith v. State, 21 Texas Crim. App., 107.)

"There can be no question as to the common design and conspiracy to effect an escape from jail, and the fact is also incontestible that the murder was committed by Cannon in pursuance of this common purpose. But, while this is so, it is insisted that the conspiracy only extended to a purpose to confine Glazner in order that the escape might be accomplished—that the evidence fails to show that appellant and Brown ever contemplated, much less agreed to, his murder or the infliction of any bodily harm upon him, and that the fatal blows dealt

him by Cannon causing death were the result of an independent act upon the part of Cannon without their knowledge or concurrence, and without the ability on their part even to prevent it.

" 'The joint responsibility of parties for each other's misconduct rests on the principle that when an act is committed by a body of men engaged in a common purpose, such act is treated as if specifically committed by each individual. It should be observed, however, that while parties are responsible for collateral acts growing out of the general design, they are not responsible for independent acts growing out of the particular malice of individuals. Thus, if one party of his own head turns aside to commit a felony foreign to the original design, his companions do not participate in his guilt.' (Whart. on Hom., secs. 201, 202; Mercersmith v. State, 8 Texas Crim. App., 211; Stevenson v. State, 17 Texas Crim. App., 619.) But it is equally as well settled that 'all combining to commit an offense to which homicide is incident are principals in homicide. As where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and in the execution of their design a murder is committed, all of the company are equally principals in the murder, though at the time of the fact some of them were at such a distance as to be out of view, if the murder be in the furtherance of the common design. . . . Malice in such a killing may be inferred as a presumption of fact *from the nature of the design and the character of the preparation;* whether the deceased fell by the hand of the accused or otherwise is immaterial. . . It is only where the causes leading to the homicide have no connection with the common object that the responsibility for such homicide attaches alone to its actual perpetrator.' (Whart. on Hom., sec. 338.)

"As stated, we have in the evidence before us a common design to escape from jail, preparations to effect that purpose, a deadly weapon prepared as a means to be used if necessary in the accomplishment of the common purpose, the use of the deadly weapon by one of the parties in endeavoring to carry out the common design. Such a homicide, committed under such circumstances, is not a collateral, independent act of the actual perpetrator, but is the act of all, because it was an act directly incident to and growing out of the common design of all.

"If, as is clearly proven, part of the common design was to imprison Glazner within the jail, and detain him therein without his consent until the parties had effected their escape, then such detention would be unlawful and constitute what in our code is denominated 'false imprisonment' (Penal Code, art. 513), for which they would be liable to punishment by a fine not exceeding five hundred dollars and confinement in the county jail not exceeding one year. (Id., art. 518.) Mr. Bishop says 'a man may be guilty of a wrong which he did not specifically intend, if it came naturally or even accidentally from some other specific or general evil purpose. When, therefore, persons combine to do an *unlawful thing,* if the act of one proceeding, according to the common plan, terminates in a criminal result, though not

the particular result meant, all are liable.' (1 Bish. Crim. L., 7 ed., sec. 636.)

"In Mercersmith's case, 8 Texas Crim. App., supra, it was said, 'Where two persons go out for the common purpose of robbing a third person, and one of them in pursuit of such common purpose kill such third person under such circumstances as to make it murder in him who does the act, then it is murder in the other. . . . Nor is it necessary that a common guilty purpose of resisting to the death any person who should endeavor to apprehend them must have been formed when the parties went out with the common design of committing the unlawful act, to render all principals in a murder by one of them whilst making such resistance.' "

This opinion has been quoted approvingly in Phillips v. State. 26 Texas Crim. App., 228; Bowers v. State, 24 Texas Crim. App., 542; Kipper v. State, 45 Texas Crim. Rep., 377.

As said by Judge White in the Kirby case, supra, if not to be used in case of emergency, why prepare and hide a piece of iron with which the murder was committed. So we may say in this case, if not to be used in any emergency, why did appellant take along with him that night a shotgun and Hughes a rifle, on their whitecapping expedition. The fact they carried these weapons, on a trip in which they say was to only whip the negroes, evidenced they contemplated it might become necessary to use them, and when they thought it necessary did use them, and this negress, who had done them no harm, yielded up her life. If they had no thought or intent to kill, why did they fire into the schoolhouse with reckless disregard of whom they might kill, and why did they shoot into the house of the negro Clark?

Rev. L. C. Dowden testified that he was present at Preston Hughes' store; that Dock Hughes, Tom Hughes and Walter Buckley were also there when appellant rode up. This was about noon of the day the killing occurred at night. That he heard a conversation between appellant and Dock Hughes. That Dock Hughes invited appellant to get down, when appellant replied he was in a hurry, remarking, "I have got to get a negro,"—saying he had been to hunt a negro. Dock Hughes replied, "Well, I have got to get one, too." That appellant got down and they walked off some steps and talked, witness not hearing the conversation. The State then proved that Buckley, Tom and Dock Hughes all ate supper together that night, and after supper they went to appellant's and he joined them, and they went to a negro's house to whip the negro. Not finding him at home, they went to the schoolhouse, and there shot into the house, running the negroes off. That they went to several negro houses, finding some at home and some absent; that they whipped McCain and Clark and shot into Clark's house, the last house visited being that of Joe Kellum, where the woman was killed. Joe Kellum, among other things, testified, that somebody came to his home that night between 12 and 1 o'clock; that he and his wife had gone to bed. "The first I knew of it, there was a man calling me at the front door, calling, 'Joe, Joe.' From the

sound of his voice he seemed to be on the front gallery,—at the front door on the gallery, and he called me, 'Joe, Joe,' like that. I didn't answer him the first time or two, and about the third or fourth time he called, I said, 'Who is that?' and he says, 'Harvey Davis, get up and open the door.' I started to get up, and as I got up I heard someone going around the house,—going around the end the chimney was in. When I heard this fellow going around the house, why, I ceased to answer Mr. Davis; I was kinder listening to him walking around the house. They went around to the back door. There was a back door to the house. There was only one door on the back of the house. I said I quit saying anything to Mr. Davis then. The one that went around the house stayed around there a minute or so. This man at the front was still calling, and this other one came right on back from around the house, and said, 'Tell him your horse is loose, and you want him to help you catch him.' The man that came back from around the house said that. I heard him walking. I heard him say, 'Tell him your horse is loose and you want him to help you catch him.' Then this one at the door told me that,—'My horse is loose and I want you to help me catch him.' I said, 'I would like the best in the world, Mr. Davis, to go and assist you in catching your horse, but my wife is sick, and I haven't got anyone to leave here with her.' He says, 'Open the door, if you don't I am going to shoot through it,' and about that time it seemed like someone else come up on the gallery where this same man was at; and then when he said, 'Open the door, if you don't I am going to shoot through it,' I didn't say anything more. I was afraid to say anything more, and then they began forcing at the door. The door was fastened with some wooden latches. There was four latches on the facing, but there wasn't but three latches on the door that night. I had the door just fastened with three on the side. They were small latches and worked on a nail. You would just turn it around when you wanted to latch it. Then they began forcing at the door, and they kept forcing at the door until they finally forced it open, and as they forced it open, I thought I would sorter hide from them. As they were calling me, I thought I would sorter hide from them and they would come in and not find me. I had been sitting on the bed from the time I heard him going around the house until I heard the door open. I got over between the head of the bedstead and the wall. This (indicating) was the head of the bedstead here. I don't know how many came in the house. There must have been more than one from the noise they made. It sounded like more than one from the noise they made on the floor. As I got up off the bed my wife got off the bed she was on and come over to the bed where I was at. There was no light in the house. As the door was forced open, there was a light struck, as well as I could tell from the reflection of the light, somewhere near the door, inside of the house, but I was afraid to look out to see who had the light, anything like that. I was trying to keep hid. As the light struck in the house, about that time, my wife says, 'I wish you gentlemen, as I am dressed

in my night clothes, I wish you would please go out of the house.'
They kept on calling me, and I was trying to keep hid. I thought
they would go out of the house and that would be all, and I remained
there right behind the bed until the light began to go out and when
the light began to go out, the shooting began in the house. Then I
remained on laying there until the shooting began, and I reached up
in the rack over my head and got a shotgun I had up there, and I
just fired it off in the house, as I laid there behind the bed. I shot
on the side of the bed. I stuck it out from the side of the bed around
the end of it and shot."

Appellant in various bills of exception objected to all the testimony
about whipping other' negroes, visiting other negro houses, and what
was said by any of the parties except appellant, on the ground that a
conspiracy must be first shown before the acts and declarations of other
parties are admissible, and on the ground that the visits to the other
houses and whipping of other negroes, and shooting into other houses
were separate and distinct offenses, and not admissible in evidence. On
proof of conspiracy Judge White early laid down the rule which has
always prevailed in this court: "The ancient doctrine that a con-
spiracy must first be established, ipso facto, before proof of acts and
declarations of the individual conspirators are admissible against each
other, is now exploded. The rule as it now exists is stated in the case
of Cox et al. v. State, 8 Texas Crim. App., 254, as follows: 'Ordi-
narily, when the acts and declarations of one co-conspirator are offered
in evidence against another co-conspirator the conspiracy should itself
be first established prima facie, and to the satisfaction of the judge of
the court trying the cause; but this can not always be required. It
can not well be required when the proof depends upon a vast amount
of circumstantial evidence—a vast number of isolated and independent
facts. And in any case where such acts and declarations are intro-
duced in evidence, and the whole of the evidence introduced on the
trial, taken together, shows that a conspiracy actually existed, it will
be considered immaterial whether the conspiracy was established before
or after the introduction of such acts and declarations.'" Smith v.
State, 21 Texas Crim. App., 107; Moore v. State, 7 Texas Crim. App.,
14; Davis v. State, 9 Texas Crim. App., 363; Kennedy v. State, 19
Texas Crim. App., 618; Clark v. State, 28 Texas Crim. App., 189;
Stevens v. State, 42 Texas Crim. Rep., 154; Cain v. State, 42 Texas
Crim. Rep., 210; Proctor v. State, 54 Texas Crim. Rep., 254.

Only the acts, conduct and declarations of appellant, Dock Hughes,
Tom Hughes and Walter Buckley were admitted, and they are shown
to have been constantly together from the time they met after supper
and masked themselves with mosquito netting until the woman was
killed, and at this time Walter Buckley was at the back door to see
that Joe Kellum did not escape that way, appellant kicked in the front
door, and Dock Hughes and Tom Hughes rushed into the room where
the homicide occurred. A conspiracy is shown to at least go and
whip the negroes that night, to which all gave their assent. They go

together, carry deadly weapons with them; attempt to hide their identity; shoot into houses, with a reckless disregard of human life, before this negro woman is killed, and the court properly admitted in evidence the acts, conduct and declarations of each of the four conspirators on this occasion. What all did under such circumstances, in furtherance of the common design, would in law be the act of each one of them.

But appellant insists the court erred in not instructing the jury that if Dock Hughes killed the woman upon an independent impulse of his own, he should be acquitted. Appellant did not testify, and, therefore, we have no declaration from him nor any other witness that would absolve him, and if such an issue is raised by the evidence, it is raised because the State could not show more than they agreed to go down into this quarter and whip some negroes that night; that they sought to conceal their identity by covering their faces with netting; that they carried a Winchester and a shotgun; that they did whip negroes, and fired their guns into houses before getting to Joe Kellum's, instigating a reign of terror in that negro settlement, and then show the conduct of the parties at the house of Joe Kellum's, testified to by Tom Hughes and Joe Kellum, and where an inoffensive negro woman was killed while sitting on her bed. But if by reason of lack of testimony the issue may have been raised that Dock Hughes killed the woman upon an independent motive of his own, of which appellant was unaware, and to which he did not give his assent, we think such issue was fully covered by the court's charge. He instructed the jury:

"All persons are principals who are guilty of acting together in the commission of an offense. When an offense has been actually committed by one or more persons, the true criterion for determining who are principals is, did the parties act together in the commission of the offense; was the act done in the pursuance of a common intent and in pursuance of a previously formed design in which the minds of all united and concurred? If so, then the law is that all are alike guilty, provided the offense was actually committed during the existence and in the execution of the common design and intent of all such persons. The mere fact that a person is present when an offense is committed does not constitute or make him a principal, but he must aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act in pursuance of a common design and purpose to commit the offense.

"And in this case if you believe from the evidence beyond a reasonable doubt that the defendant, Harvey Davis, was present at the time Grace Kellum was killed, if she was killed, and if you believe from the evidence beyond a reasonable doubt that Dock Hughes, Walter Buckley and Tom Hughes, Jr., or either of them, killed Grace Kellum, if she was killed, yet, if you find from the evidence, that the defendant, Harvey Davis, did not aid, or encourage the said Dock Hughes, Walter Buckley, or Tom Hughes, Jr., or either of them, to kill Joe Kellum or Grace Kellum, by any word or act or gesture, and did not know the unlawful intention, if any, of the said Dock Hughes, Walter Buck-

ley, and Tom Hughes, Jr., or either of them, to kill Grace Kellum or Joe Kellum, or to commit some unlawful act which might lead in its natural or probable consequences to the killing of Joe Kellum or Grace Kellum, or if you have a reasonable doubt about this, then you will find the defendant, Harvey Davis, not guilty."

This in plain language tells the jury that if Tom Hughes, Dock Hughes or Walter Buckley killed the woman, and appellant did not know the unlawful intention, if any, of the above named men, or either of them, to kill, to acquit, and if he did not aid or encourage them in the act to acquit. But appellant says this shifted the burden on him to prove these facts, as the court required the jury to find that he *did not,* etc., before they would be authorized to acquit. This charge might be susceptible of this criticism if it were not for the concluding part of the charge, where the court plainly told the jury, "or if you have a reasonable doubt" about such matter you will acquit. A charge similar to the above, where it failed to apply the doctrine of reasonable doubt to such state of facts, was criticised, in Johnson v. State, 29 Texas Crim. App., 150, but in that case it was held only that the reasonable doubt must be applied to that state of facts, as well as to others, and this the court did in the charge quoted above. Powell v. State, 28 Texas Crim. App., 393; Edens v. State, 55 S. W. Rep., 816.

It was not necessary to define the word "corroborate." Its meaning is too well understood, and the charge on accomplice testimony is clothed in language frequently approved by this court.

Appellant also contends that the court erred in instructing the jury on killing "by mistake or accident," he contending there is no evidence to show that the killing was by mistake or accident. The evidence and all the evidence is that the parties went to the Kellum residence after Joe Kellum and not after his wife, and, according to Tom Hughes' testimony Joe Kellum fired first, and if this is true, the circumstances would all tend to show that Dock Hughes was more than probably shooting at the man who shot him, and whom they had gone to and broke into the house to get. Again, Joe Kellum says that Dock Hughes fired first; that he had gotten behind the bed to keep them from finding him, but about this time he reached for his gun, and if Dock Hughes saw him reaching for his gun, it is more than probable that he shot at Joe Kellum, when he killed the woman. At all events the evidence raised the issue that Dock Hughes may have been shooting at Joe Kellum when the woman was killed, and this exception to the charge is not well taken.

It was not necessary to charge on circumstantial evidence, as there is direct and positive testimony as to who killed Grace Kellum, and direct and positive testimony that appellant kicked in the door, and was acting with the person who fired the shot, in breaking in the house at least.

The other special charges requested, in the main, are not the law as applicable to the evidence adduced on this trial, and in so far as they

state correct propositions of law were fully covered by the charge as given.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE, dissenting.

[Rehearing denied December 22, 1915.—Reporter.]