## STATE OF HAWAII *v.* JAMES JONES.

### No. 4182.

September 20, 1961.

Tsukiyama, C. J., Cassidy, Lewis, JJ., Circuit Judge Jamieson Assigned by Reason of Illness of Wirtz, J., and Circuit Judge Crockett Assigned by Reason of Vacancy.

248

OPINION OF THE COURT BY TSUKIYAMA, C. J.

Defendant was tried and convicted by a jury in the first circuit court under indictment for robbery in the first degree. The case is now before this court for review on writ of error.

Seven assignments of error are specified and relied upon by defendant (plaintiff in error here), to wit, Nos. 1, 2, 4, 5, 6, 8 and 10, Assignment No. 7 having been withdrawn by defendant in the reply brief, while Nos. 3 and 9 were not included in the specification of errors.

Assignment No. 1 relates to the denial by the trial court of defendant's plea in bar and motion to dismiss the indictment upon the ground of violation of R.L.H. 1955, § 221-10, in that the selection of the grand jury which returned the indictment "was not made without reference to the race or place of nativity or sex of the persons selected." Prior to the commencement of trial, defendant's plea in bar and motion to dismiss were heard in the absence of the jury. O. H. Tompkins, a jury commissioner, was called by defendant as a witness and minutely examined by all counsel. Stripped of all the furbelows, the essence of his testimony may be epitomized by reference to the following questions and answers appearing in the

transcript. On the issue of whether the grand jury was selected with reference to race:

"Q (By Mr. Titcomb) Mr. Tompkins, did you, in helping to arrive at the selection of the 150 prospective grand jurors, did you personally look to that Question No. 6 on the questionnaire and base your determination on the racial ancestry of the applicant?

"A None whatsoever. At the time—I might say this, that at the time that the vote was taken between the five jurymen—between the five commissioners, the racial question was not mentioned at all. In fact, I didn't even have it in mind, having nothing of the kind in mind. We were trying to get men that we felt —men and women whom we felt were qualified for the jury."

On the issue of whether the selection was made with reference to place of nativity:

"BY MR. CHANG:

"* * *

"Q Well, did you consider the place where each of these prospective grand jurors came from in your selection of the grand juror?

"A I didn't hear you.

"Q Did you consider the country, the place where they came from?

"A We did not consider the country at all, just the time that they had been here in the Territory of Hawaii.

"Q Did you consider anything in regard to, for example, their birth place: Germany or China?

"A We did not consider the time—the place of his birth at any time.

"Q Then why did you feel that a person who lived in the Territory longer than another could be more qualified as a grand juror?

"A Well, we figured that a person being born here knew conditions here, knew the people, knew conditions here, the different races of people that were here, and so forth.

"* * *

"Q (By Mr. Titcomb) You testified that the controlling factor or one of the controlling factors was the amount of time that an applicant spent in the islands and not where he was born?

"A Right.

"Q Is it safe then or is it fair for me to say then that you considered residency in the islands and not place of nativity as the criteria?

"A Residence.

"Q And not where he was born?

"A No."

On the issue of whether the selection was made with reference to sex:

"BY MR. SOARES:

"* * *

"Q Can you account for the fact that in the list of 50 grand jurors the first 15 are women and the last 35 are men?

"A You say, can I account for that?

"Q Yes, that circumstance.

"A In the years before, there was a judge of the Circuit Court that insisted on having 50-50, having an equal number of women and men on both the grand jury and the trial jury. Later we were informed by the judges of the Circuit Court that that could be changed at the discretion of the jury committee.

"Q Will you answer my question, please? I take it you are through with what you had to say. My question was, can you account for the first 15 on the list being women and the last 35 on the list being men?

"A I cannot account for that. I did not know that that was true.

"Q Well, did you take into consideration any proportion of men and women in making up the grand jury list?

"A We did.

"Q And what proportion did you take into consideration?

"A The same proportion that you mentioned, 15 to 35 out of the 50.

"Q In other words, you deliberated and hit on the plan of making 30 per cent women and 70 per cent men —

"A That's right."

Defendant, in his brief, quotes from commissioner Tompkins' testimony at great length and contends that it amply reveals the selection of the grand jury with reference to race, place of nativity and sex, in contravention of R.L.H. 1955, § 221-10. His assertions and conclusions are not undergirded by the citation of any authority other than the said statute, thus placing upon this court the onus of making a thorough research in order that justice may be done. The pertinent portion of said statute reads:

"§ 221-10. *Jury lists.* * * *

"All of such selections shall be citizens whom the respective commissions believe, after careful investigation in each case, to be qualified and not exempt under the provisions of this chapter. All of such selections shall be made without reference to the political affiliations or to the race or place of nativity of citizens, with a view to obtain lists representative of the qualified citizenry of each circuit."

A careful examination and study of the statute, in the light of the generally recognized judicial concept relating to the matter of grand jury selection, indicate that,

while its primary purpose is to interdict, in the selection of jurors, discrimination of citizens or classes of citizens, otherwise qualified, it does not prevent the jury commission from exercising its honest and fair discretion to include in the jury list qualified names representing a cross-section of the community. The very statute in question expressly provides that all selections shall be made "with a view to obtain lists representative of the qualified citizenry of each circuit."

The points involved in the issue under consideration are clearly stated in 24 Am. Jur., *Grand Jury,* § 27, pp. 851-2: "It is generally recognized that an intentional discrimination against a race or class of persons, solely because of their race or class, by officers in charge of the selection and summoning of grand jurors in a criminal case is a violation of the constitutional rights of an accused which violation is not excused by the fact that the persons actually selected for jury service possess the necessary qualifications for jurors as prescribed by statute. Such action by administrative officers is as much a violation of constitutional rights of the accused as if the discrimination resulted from provisions of a statute. Thus, it is universally held that discrimination against members of the negro race by officers charged with the selection and summoning of jurors in a criminal case is a violation of the constitutional rights of a negro defendant, either as a deprivation of due process of law or as a denial of the equal protection of the laws. Similarly, it is held that a discrimination against citizens of another nationality is a violation of the constitutional rights of a defendant of that nationality, that the intentional exclusion from a grand jury of all persons belonging to the same political party or faction as the defendant in a prosecution arising out of a political controversy is a denial of the defendant's constitutional rights, and that discrimination against

persons of certain religious faith is a violation of the constitutional rights of a defendant of that faith. It is also recognized that the constitutional rights of an accused may be violated if women eligible for service on grand juries are intentionally excluded therefrom. This does not mean, however, that a defendant in a criminal case has any constitutional right to be indicted by any particular grand jury or by one composed in part of members of his race or class; the constitutional guaranty merely forbids any intentional discrimination against race or class. All that the accused can demand is that he be indicted by a jury from which members of his race or class, as a race or class, have not been intentionally excluded. The mere fact that jury commissioners fail, when acting fairly and honestly, to give a full pro rata representation to a member of a race or class does not violate the constitutional rights of a defendant who is a member of such race or class."

It is a cardinal principle applied in every jurisdiction that in the selection of grand juries the selection must be made fairly, honestly and impartially, and without systematic, arbitrary and purposeful design to discriminate against any qualified citizen or class of citizens, and to achieve that end the officials in charge are clothed with broad discretion. "The officials charged with the drawing or selection of the grand jury are usually vested with a wide discretion in the selection of grand jurors and the determination of their fitness, but they must exercise impartiality in the performance of their duties." 38 C.J.S., Grand Juries, § 12, p. 1003. Such discretion exists and must necessarily be applied, especially in a jurisdiction such as ours where the statute provides for selections of jurors by the jury commission "with a view to obtain lists representative of the qualified citizenry of each circuit."

The prosecution cites and dwells at considerable length

on the case of *Akins* v. *Texas*, 325 U.S. 398 (1945). The selection of the grand jury in that case was assailed on the ground that only one Negro was selected in a county where there were a large number of Negroes. In upholding the grand jury, the Supreme Court differentiated that case from *Hill* v. *Texas*, 316 U.S. 400 (1942), in which the court had vitiated an indictment returned by a grand jury without any Negro member, saying: "* * * Our directions that indictments be quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the theory that their continual exclusion indicated discrimination and not on the theory that racial groups must be recognized. * * * The mere fact of inequality in the number selected does not in itself show discrimination. A purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination. * * * Any such discrimination which affects an accused will make his conviction unlawful." Significantly, five years thereafter, in *Cassell* v. *Texas*, 339 U.S. 282 (1950), the Supreme Court vitiated another indictment, holding: "* * * The statements of the jury commissioners that they chose only whom they knew, and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population, prove the intentional exclusion that is discrimination in violation of petitioner's constitutional rights."

*Wong Yim* v. *United States*, 118 F. 2d 667 (9th Cir. 1941), is a case which had its inception in the United States District Court for the District of Hawaii. The defendant, indicted for conspiracy, moved to quash the venire on the ground that of the panel of thirty-five jurors, thirty-two were Caucasians, one was of Chinese ancestry

and two were of Caucasian-Hawaiian ancestry. There was no evidence that any particular racial group was excluded as jurors. Although the trial jury and not the grand jury was involved, the Ninth Circuit Court affirmed the denial of the motion to quash adhering to the universal rule "* * * that a violation of the clause [due process] occurs if in the jury there is a systematic or arbitrary exclusion of, or a discrimination between, persons of a particular race * * *." See also *United States* v. *Flynn,* 103 F. Supp. 925 (S.D.N.Y. 1951); *Swain* v. *State,* 215 Ind. 259, 18 N.E. 2d 921; *United States* v. *Local 36 of International Fishermen & Allied Workers,* 70 F. Supp. 782 (S.D. Cal. 1947); *Bary* v. *United States,* 248 F. 2d 201 (10th Cir. 1957).

*Bary* v. *United States, supra,* at 206, clearly and comprehensively summarizes the pertinent aspect of the law as follows: "* * * While officials charged with the responsibility of selecting names of persons for service on grand and petit juries may exercise some discretion to the end that competent persons be selected, it is the long and unbroken tradition that methods and procedures must be employed which contemplate grand and petit juries from and truly representative of the cross-section of the community. It is not essential however that every grand jury or petit jury include representatives of all racial, economic, or social groups of the community. Neither is exact proportional representation of ethnic, economic, or social groups a prerequisite to validity. * * * But an indictment returned by a grand jury * * * cannot stand if representatives of such groups were systematically and arbitrarily excluded * * *."

It should be noted, however, that the federal rule, as recognized in *Fay* v. *New York,* 332 U.S. 261, is not altogether the State rule, particularly in regard to the effect of discrimination other than racial.

In this jurisdiction, prior to 1932 when the law was amended to read as earlier quoted herein and as it now appears in the second paragraph of R.L.H. 1955, § 221-10 (Act 18, First Sp. S.L.H. 1932), the statute (then R.L.H. 1925, § 2402) provided that the jury commission "shall proceed to select and list from citizens, voters and residents of the several precincts in the circuit, as near as may be according to and in proportion with the respective number of registered voters last registered in each of the precincts. * * *" In *Territory* v. *Braly*, 29 Haw. 7 (1926), the defendant by plea and motion challenged the indictment and the array of grand jurors who indicted him, on the ground that the jury commissioners in making up the grand jury list did not make their selection in strict conformity with the above quoted legal requirement. In affirming the denial of the plea and motion, this court in substance held that the legislature did not mandate meticulous observance of the procedural requirements; that the statute by its very terms vested in the jury commission a wide discretion in making the apportionment of jurors so as to equitably distribute the burden of jury service among the voting precincts; and that so long as such discretion was not abused but honestly and fairly exercised no one had any ground for complaint.

We have carefully examined the second paragraph of § 221-10. By its very terms a legislative intent to vest in the jury commission a broad discretion is perspicuously revealed. There is no evidence in the case at bar which leads this court to believe that the jury commission did systematically, arbitrarily and purposefully, make its selection of the grand jury list with reference to race or place of nativity, or that any qualified citizen was excluded or included solely because of his race or place of nativity. Commissioner Tompkins categorically denied giving any consideration to a prospective juror's racial

background. He also testified that a person's length of residence and not his place of birth, was considered along with his education, occupation, experience in jury service, and other related matters, in the determination of his general qualification as a grand juror. After reviewing the commissioner's lengthy testimony which ran the whole gamut of criteria applied in the selection of grand jurors, this court perceives that he drew a fair conclusion when he stated: "We were trying to get men that we felt —men and women whom we felt were qualified for the jury."

This brings us to that portion of defendant's plea which, as amended, asserted that the grand jury "was selected in violation of section 221-10 of the Revised Laws of Hawaii 1955 in that such selection was not 'made without reference to the * * * sex' of the persons selected."

The attack being based on § 221-10 will be so considered. No constitutional issue is involved. Section 221-10 does not contain the words "or sex," unless they are by implication construed as appearing there by virtue of S.L.H. 1951, Act 91, which by its terms took effect following the enactment of the Act of Congress approved April 1, 1952 (66 Stat. 32, c. 127), amending section 83 of the Hawaiian Organic Act. This 1951 Act is considered below. Section 12, Article I of the Constitution of the State of Hawaii, which provides against the disqualification of any person to serve as a juror because of sex, was not in force at the time of this indictment.

The words "without reference to the political affiliations or to the race or place of nativity of citizens" were inserted in what is now § 221-10 by the above-cited 1932 amendment (Act 18, First Sp. S.L.H. 1932), at which time the provision for apportionment by precincts was deleted. However, the words "without reference to race, or place of nativity" have appeared in R.L.H. 1955,

§ 221-1(e), ever since that section was enacted by S.L.H. 1903, Act 38. The provision there reads:

"§ 221-1. *Qualifications.* A person is qualified to act as a juror or grand juror:

"* * *

"(e) If he is selected, summoned, returned and sworn without reference to race, or place of nativity."

This provision evidently was included in what is now § 221-1 by reason of section 83 of the Hawaiian Organic Act, which abolished all juries consisting of aliens or foreigners only, or natives of Hawaii only, and provided further that "all juries shall hereafter be constituted without reference to the race or place of nativity of the jurors." Previously, as set out in sections 1331 and 1332 of the Civil Laws of 1897, specifically repealed by section 7 of the Hawaiian Organic Act, a native Hawaiian, accused of any crime, was entitled to be tried by a jury composed entirely of natives, and a foreigner by a jury composed entirely of foreigners, while in all civil cases in which one party was a native Hawaiian and the other a foreigner (alien or naturalized) the jury was composed of an equal number of natives and foreigners, drawn alternately from separate boxes.

When § 221-10 was amended in 1932 as above set out, § 221-1 was amended by the same Act 18. However, the above-quoted provisions of subsection (e) were reenacted as in the original 1903 Act; the words "without reference to political affiliations" were not added there though inserted in § 221-10 as part of the general expression "without reference to the political affiliations or to the race or place of nativity of citizens, * * *." Likewise, in 1951, Act 91 amended § 221-1, contingent upon congressional action which was obtained in 1952, and deleted the word "male," thus removing the previous requirement that a juror be a male citizen. But subsection (e) was not

amended, *i.e.*, the words "without reference to sex" were not added.

Sections 1 and 2 of S.L.H. 1951, Act 91, read as follows:

"Section 1. *Section 9791* of the Revised Laws of Hawaii 1945, as amended, is hereby further amended by deleting the word 'male' in the third line of said section.

"Section 2. Any other law relating to jurors in the Territory is hereby amended so as to remove any discrimination against women and shall be construed to apply without regard to sex."

Assuming in defendant's favor that section 2 amended § 221-10 by implication, it clearly did not so amend § 221-1, then R.L.H. 1945, § 9791, which had been amended by section 1 and was not "any *other* law." (Underscoring added.)

Defendant argues that § 221-10, which he reads as containing the words "without reference to sex," is a "prohibitory law" within the meaning of R.L.H. 1955, § 1-9, which provides that: "Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed." However, that section is not pertinent.

By a long line of cases, *e.g., Territory* v. *Ferris,* 15 Haw. 139 (1903); *Territory* v. *Chung Nung,* 21 Haw. 66 (1912); *Territory* v. *Scully,* 22 Haw. 618, 631 (1915); *Territory* v. *Braly,* 29 Haw. 7 (1926), this court has distinguished between a challenge to the array before impanelment of the grand jury and a motion to dismiss an indictment because of objections to the grand jury. In the latter case, this court has declined to dismiss in the absence of improper motive on account of "* * * a mere irregularity * * *", if the grand jury finding the indictment and as finally constituted is composed wholly of qualified persons, and if the defendant is not injured by the pro-

ceedings. * * *" *Territory* v. *Chung Nung, supra* at 68. If only an "irregularity" is involved here, then R.L.H. 1955, § 231-15 definitely requires that injury appear if advantage is to be taken of it. *Matsumura* v. *County of Hawaii,* 19 Haw. 496 (1909).

There was no improper motive in this case. As to there being thirty per cent women and seventy per cent men on the grand jury, Commissioner Tompkins explained that women were relatively new in jury service and a larger proportion of them were prone to claim exemption, and that the commission was informed by the circuit judges that it could exercise discretion in determining the ratio between men and women. It was due to a misunderstanding of the law that the jury commission adopted a rule of thumb of 30-70.

The adoption of this fixed ratio was an error of judgment. However, we do not know whether, if ordinary discretion had been exercised and this rule of thumb had not been adopted, there would have been more men on the list or more women, nor do we know whether in that case the jury would have been more favorably inclined to defendant or less so. Furthermore, we have not been informed as to the actual composition of the panel which returned the indictment.

Defendant does not assert prejudice and none appears. Reliance by defendant is upon the contention that none need be shown.

Section 221-1(e) clearly provides that a person is not qualified to act as a grand juror unless he is selected without reference to race or place of nativity. One who relies upon that provision need not show prejudice. The legislature easily could have added political affiliations and sex as factors in the same category. It did not do so. The direction, therefore, in § 221-10 that selections be made without reference to political affiliations or (assuming

in defendant's favor an amendment by implication) without reference to sex, falls into a different category. Improper motives or prejudice must be shown to take advantage of such objection by a motion to dismiss the indictment. This showing was not made.

Cases decided elsewhere are not particularly helpful, as there are many distinguishing factors. See annotation in 9 A.L.R. 2d 661. However, the following are somewhat in point: *State* v. *Salen*, 231 Wis. 489, 286 N.W. 5; *People* v. *Parman*, 14 Cal. 2d 17, 92 P. 2d 387; *Quinones* v. *United States*, 161 F. 2d 79 (1st Cir. 1947).

We are satisfied from the evidence that the jury commission acted in good faith and that there was an honest intention on its part to conform to the law in the selection of grand jurors "with a view to obtain lists representative of the qualified citizenry of each circuit." Apropos is the ruling made in *United States* v. *Ambrose*, 3 Fed. 283 (C.C.S.D. 1880) : "I think that any irregularity arising from motives other than those of an evil character—any slight irregularity, such as may arise in any case in spite of the greatest care and caution—is not fatal to the indictment." See also *Hauptman* v. *United States*, 43 F. 2d 86 (9th Cir. 1930) ; *State* v. *Stewart*, 2 N.J. Super. 15, 64 A. 2d 372. *Cf. Bain* v. *Commonwealth*, 283 Ky. 18, 140 S.W. 2d 612.

It is the view of this court, therefore, that the trial court did not err in denying defendant's plea and motion to quash.

Assignment No. 2 relates to the trial court's ruling sustaining the State's challenge of prospective trial juror, Mrs. Silva, for cause. It is shown by the record that on her *voir dire*, Mrs. Silva stated that she did not believe that she would make a good juror because "I'm always feeling sorry for people who get themselves into trouble, so I think I will be prejudiced." In the course of exami-

nation, the court asked: "Well, did I understand you to say that if you were convinced beyond a reasonable doubt of the guilt of the defendant, you might let him go, because of your sympathy?" Mrs. Silva's reply was, "Yes." Although, upon questioning by counsel for defendant, it appeared that she modified her previous affirmative reply, the court was obviously unimpressed. Mrs. Silva was excused over objection and an exception was duly noted.

The rule is universally recognized that the matter of excusing trial jurors lies in the discretion of the trial judge. Unless it patently appears that such discretion has been abused and that the defendant has not been given a fair trial resulting from the abuse, an appellate court will not interfere with the exercise of judicial discretion. *Territory* v. *Johnson,* 16 Haw. 743; *Territory* v. *Robello,* 20 Haw. 7; *Territory* v. *Lee,* 29 Haw. 30. In *Territory* v. *Wright,* 37 Haw. 40, this court not only affirmed the general rule, but approved the statement in Thompson & Merriam on Juries, section 271, to the effect that where justice has been done by an impartial jury, an improper allowance of a cause of challenge would not necessarily work a reversal of the judgment, although the disallowance of a cause of challenge did have that effect, the stated reason therefor being: "A qualified juror may be rejected, and still a jury of lawful men, against whom there is no objection, may be obtained." It is significant that in the case at bar, the State had not exercised two of its three peremptory challenges, and that after the *voir dire* the jury was accepted by defendant as well as by the State without objection.

Defendant's contention that the State did not assign any cause for challenging Mrs. Silva pursuant to R.L.H. 1955, § 231-11, is without merit. Where the cause for challenge evolved in the course of the examination of a prospective juror is so obvious that the trial judge may

*sua sponte* excuse him for cause, it is idle to require an assignment *in totidem verbis. The King* v. *MacFarlane,* 7 Haw. 352.

Under Assignment No. 4, defendant assigns as error the trial court's denial of his motion for a directed verdict, contending that the proof failed to sustain the material allegations of the indictment, namely: that defendant was "armed with dangerous weapon"; that defendant had the "intent, if resisted, to kill, maim, wound, and inflict other corporal injury upon Lawrence Bert Johnson"; that defendant "did rob, steal, take and carry away a wrist watch and money from the custody and in the presence of Lawrence Bert Johnson"; that defendant committed such acts "by the use of force and by putting the said Johnson in fear of life and bodily injury"; that defendant committed "the crime of robbery in the first degree in violation of law."

In essence, the contention is that when defendant arrived at the scene, "the robbery had been completed"; that he merely "held" a gun which was handed to him by another defendant and which evidently had fully served its purpose before his arrival; that although not a personal participant, the indictment directly charged defendant with the commission of all the alleged acts as a principal rather than as an accessory, thus denying to him the constitutional right to be informed of the nature and cause of the accusation against him.

For a full understanding of the issues raised by the foregoing contention, the pertinent facts as disclosed by the evidence must be reviewed. On the evening of June 3, 1959, two sailors, Johnson and Edler, were in a restaurant at the corner of Hotel and Bishop Streets in Honolulu. When two girls who were also there walked out, the sailors also left the restaurant. It is not clear whether they intended to follow the girls, but they walked up Emma

Street on the left side, while the girls took the right side. When they reached a point near a church, a car drove out from the corner with three men in it, Betonio, Vairos and Jones, the defendant. Betonio alighted from the car and was seen talking to the girls. The sailors continued walking up on the left side of the same street. After the girls crossed the freeway and continued up the street, the sailors crossed over to the other side and began to walk back in the direction from which they had originally started, when they were met by Betonio. A conversation ensued and Betonio told them to "walk up the road" because he had made arrangements to meet the girls. While Betonio went back to the car which was parked on Vineyard Street, the sailors changed their course and began walking up Emma Street again. As they approached the freeway, Betonio and Vairos caught up with them. After crossing the freeway and continuing up the street, they reached the grounds of Royal School. They entered through an opening in a hedge and finally reached a bungalow. The time was approximately 10:00 p.m. Suddenly, Betonio and Vairos pointed guns at the sailors. Betonio exclaimed, "This is a holdup!" and ordered them to put their hands up against the bungalow wall, threatening to shoot them "if they tried anything." At that instant, defendant jumped over a railing and appeared on the scene. Vairos handed his gun to defendant who "held it," while Vairos joined Betonio in the act of taking certain personal belongings of the sailors including wrist watches, wallets, money and other things. Thereafter, the two victims' hands were tied with laces taken from the shoes of one of them. Both were also gagged, the first victim with his own handkerchief and the second with a piece torn from the shirt of the first victim. After ordering the sailors to lie prostrate on the ground, Betonio, Vairos and defendant left the scene.

About two days later, police officer George Sonoda noticed defendant closing the trunk of his car on Puuhale Street, which contained a number of saddles. Having had a previous report on stolen saddles, the officer suspected and placed defendant under arrest for investigation. Upon searching the car, he found wrist watches and billfolds under the front seat. These articles together with two guns and the ripped shirt were properly identified and admitted in evidence.

Defendant Jones was the owner of the car which was driven by him on the particular night of the robbery. In his own written statement, signed by him and received in evidence, he admitted that he owned the two guns; that he knew Betonio and Vairos were taking the guns from his car; that he was told to meet them at Royal School; that he saw the whole scene of the holdup; that he received "about two bucks" of the money taken "to put gas in my car." When questioned by police officer Tasaka at the police station as to how Betonio obtained the guns from the car trunk, defendant replied: "Oh, maybe I went give him the key."

During the investigation and in his written statement, defendant stated that he did not know the real reason for the guns being taken out of the trunk saying: "I not really sure if he [Betonio] was going to use it or just carry it, or use it for . . ." He further stated that in going to Royal School, he "kind of had an idea" that it had something to do with the girls.

The indictment in the case at bar charged defendant *in totidem verbis* with the commission of the offense of robbery in the first degree, the material allegations thereof being that defendant, being armed with a dangerous weapon and with intent, if resisted, to kill, maim, wound and inflict other severe corporal injury upon Lawrence Bert Johnson, feloniously did rob, steal, take and carry

away a wrist watch and money from the custody and in the presence of Johnson, by the use of force and by putting said Johnson in fear of life and bodily injury. There appears nothing in the indictment otherwise than that defendant was charged with the alleged crime as principal.

It is a well established rule, supported by express statutory provisions in this jurisdiction, that any person who takes part in the commission of any offense, or being present, in any manner aids others in the commission of the offense, is deemed a principal therein and is subject to "indictment, trial and punishment therefor, in the same manner and to the same effect as if he had been present at the commission thereof and actually taken part therein." R.L.H. 1955, § 252-1 and § 252-4.

The foregoing rule is dispositive of the issues raised under this assignment. Where two or more persons are present and participating in the commission of an offense, each is responsible for the acts and declarations of the others, done or made in furtherance of the perpetration and all legal presumptions pertaining to the offense are applicable to him. It is not necessary to prove by direct evidence that each one committed all the acts of which the offense consists. If each person does one act which is an ingredient of the offense or immediately connected or leading to its commission, he is as much a principal as if he had committed the whole offense with his own hands. *State* v. *Priest,* 117 Me. 223, 103 Atl. 359; *Davis* v. *State,* 78 Tex. Crim. 352, 180 S.W. 1085; *People* v. *Tallent,* 89 Cal. App. 2d 158, 200 P. 2d 214. In *Territory* v. *Ebarra,* 39 Haw. 488, this court, in pursuance of such rule, held "that those physically present at the scene of a robbery who render it countenance and encouragement and who stand ready to assist in its perpetration, should the necessity arise, may be charged as principals," and that "direct evidence that an accused so charged stole the property

from the victim with his own hands, or forcibly assaulted or directly participated in any other act of violence upon the victim, is not required." Very recently, this court ruled that a person who acts in a capacity similar to a watchman while confederates commit a crime is guilty of the offense as a principal. *State* v. *Carvelo,* 45 Haw. 16, 361 P. 2d 45 (March, 1961). See also *State* v. *Yoshida,* 45 Haw. 50, 361 P. 2d 1032 (April, 1961); *Territory* v. *Bollianday,* 39 Haw. 590.

The instant case is not one in which defendant aided *in absentia.* He was in the company of Betonio and Vairos during the entire evening, driving from Waimanalo and then cruising around in the city. The car was his, the guns which figured in the crime were his, and it was he who gave to Betonio the key to the trunk where the guns were. He knew they were all following the two sailors to Royal School. Although he lagged behind, he arrived in time to notice the sailors with their hands up against the bungalow at the point of guns held by Betonio and Vairos. At that very moment, defendant jumped into the scene. Johnson testified that he and Edler had just "barely got our hands against the wall, and this fifth person jumped over the rail," and that the search and taking of their belongings followed. Edler testified likewise that "they started taking our belongings after the last man appeared." Vairos, a direct participant, also testified that when they pulled the guns on the sailors, Jones "came over the rail," and that "after I took out the sailor's wallet, I handed him (Jones) my gun." He continued that thereafter he took "the sailor's wrist watch and then Betonio handed his gun to me, and then he took the other sailor's things and tied him up." Having personally held the gun throughout the episode of brigandage, accepted a part of the monetary booty, and driven back to Waimanalo with his comitiva, it must have been obvious to

the jury that he had a direct part in the whole machination. Defendant cannot be heard to say that he was not a direct participant in the crime as a principal; nor is there any merit to his contention that there was a failure of proof to sustain the material allegations of the indictment.

Defendant's contention that he was "not armed at any time" and that, "when he came on the scene, the robbery had been completed" does not coincide with the pellucid evidence to the contrary. In the light of the abundant evidence in this case, it is obvious to this court that the indictment properly charged defendant as principal; that there was no infringement of his constitutional rights, for the language of the indictment, following substantially the provisions of R.L.H. 1955, Chapter 306, which prescribes the crime of robbery, clearly and unmistakably apprised defendant of the nature and cause of the accusation against him; and that all the material allegations of the indictment were established by substantial evidence, indeed far more than a mere scintilla. We find no error, therefore, in the denial of defendant's motion for a directed verdict.

Assignments Nos. 5 and 6 relate to two instructions given by the trial court at the request of the prosecution, setting forth the elements of the crime and the recognized definitions of certain words. (State's Requested Instructions Nos. 2 and 7.) Defendant's objection thereto is merely that they were not applicable to him. We do not agree. The instructions correctly presented to the jury the applicable law in the light of the indictment and the evidence.

The remaining two assignments, Nos. 8 and 10, relate to the trial court's refusal to give Defendant's Requested Instructions Nos. 1 and 11. The former purported to instruct the jury to return a verdict of not guilty and

the latter to charge the jury on defendant's version of the elements required to convict. We believe that our extensive discussion of Assignment No. 4 amply shows the propriety of the trial court's refusal.

Judgment is affirmed.

*O. P. Soares* for defendant-plaintiff in error.

*John H. Peters,* Prosecuting Attorney, and *Francis T. DeMello,* Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-defendant in error.