12 P.3d 873

STATE of Hawai'i, Plaintiff–Appellee,

v.

Joaquin CRISOSTOMO, also known
as Sonny, Defendant–Appellant.

No. 22363.

Supreme Court of Hawai'i.

Nov. 14, 2000.

Michael G.M. Ostendorp, Honolulu, and Shawn A. Luiz, on the briefs, for defendant-appellant.

Don Fudo, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

On February 25, 1998, defendant-appellant Joaquin Crisostomo was convicted of three counts of sexual assault in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 707–732(1)(e) (1993),[1] and two

counts of sexual assault in the fourth degree, in violation of HRS § 707–733(1)(a) (1993).[2] On appeal, Crisostomo argues that his conviction should be reversed because the trial court erred by: (1) dismissing, sua sponte, a juror who failed to timely appear on the second day of trial without sufficient cause or consultation with counsel; and (2) allowing prejudicial hearsay testimony of a prosecutorial witness. For the reasons set forth below, we affirm Crisostomo's conviction and sentence.

## I. BACKGROUND

Crisostomo was arrested and charged with three counts of sexual assault in the third degree and two counts of sexual assault in the fourth degree for allegedly fondling his friend's eldest daughter (Complainant), who was then sixteen-years-old, while the friend was at work.

### A. Dismissal of Juror

At the commencement of jury selection, the trial court informed the prospective jurors in pertinent part that "we generally begin on those days that you are in session at 9:00 in the morning. And we adjourn around the noon hour for ... the lunch recess. And you come back at 1:30. We will generally adjourn you at 4:00 in the afternoon."

Trial began on November 18, 1998. At the end of the first day's proceedings, the trial court again instructed counsel, as well as the jurors, that

> [w]e're going to adjourn for the day. And we'll come back tomorrow morning, continuing with the State's evidence in this case, at 9:00. Please leave your notebooks in the chair. They'll be returned to you in the morning. And of course, my instructions regarding your communications with each other or with anyone else—the evidence in this case is in effect. We'll see everyone tomorrow morning, 9:00.

---

1. HRS § 707–732(1)(e) provides in relevant part that "[a] person commits the offense of sexual assault in the third degree if ... [t]he person knowingly, by strong compulsion, has sexual contact with another person or causes another person to have sexual contact with the actor[.]"

2. HRS § 707–733(1)(a) provides in relevant part that "[a] person commits the offense of sexual assault in the fourth degree if ... [t]he person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion[.]"

Prior to reconvening the jury on the second day of trial, the following colloquy occurred between the court and defense counsel:

THE COURT: ... I am informed that juror in chair number 4, Mr. Luis, is still in Ewa Beach and was not really clear as to whether he's supposed to be here for the time that he's supposed to be here. So in light of the distance that it takes to get from Ewa Beach to here, which is about—in this weather and traffic and so forth is about an hour, I don't see any reason to delay the proceedings waiting for the one juror when everyone else is here and we do have an alternate.

So I will be seating the alternate number 1, Miss Madlener, in place of Mr. Luis. And we will inform Mr. Luis that he need not come at this time. He seems to have been real confused about that. If there's an objection to that, you may put that on the record.

[DEFENSE COUNSEL]: Yes, Your Honor. We would be objecting for the record, because Mr. Luis had indicated—well, he was present. And we believe that all of the jurors were adequately advised yesterday that they should be back at 9:00.

THE COURT: It is now 9:20, and Mr. Luis is in Ewa Beach.

[DEFENSE COUNSEL]: Yeah. Well, we don't think that that's the Court's fault. But that's what we're saying. But we also feel that Mr.—that it would be appropriate to have Mr. Luis. We believe that the composition of this jury would be changed dramatically in the fact that Mr. Luis is I believe only one of four males on the jury. And it would—we believe that that would significantly shift the balance.

We believe that Mr. Luis was a good juror. And we had questioned Miss Madlener, and we believe that she could also be a fair juror in this case. We didn't have any problems with her. But we are concerned about the shift in the composition of this jury in terms of the male/female ratio.

And the other thing is that Mr. Luis had indicated that he has nine children. And we believe that he's more able to determine credibility of children than some of the other persons. And we believe that his experience with children on the jury would have been beneficial.

THE COURT: All right. Your objection is noted for the record. All the jurors have—to be fair and impartial at this point, including the alternate. So let's bring in the jury. We're ready to proceed.

Trial was then recommenced with alternate Madlener in place of juror Luis.

B. *Witness Testimony*

Prior to trial, Crisostomo filed a motion in limine to exclude, *inter alia*, any evidence that was not provided in discovery, including surprise witnesses or evidence. At a hearing on Crisostomo's motion, the following discussion took place:

[DEFENSE COUNSEL]: The other thing is surprise witnesses. We were just informed that this Charlene Fale person on the State's witness list, that person wasn't mentioned anywhere in any of the discovery which was provided.

THE COURT: What is the person's name?

[DEFENSE COUNSEL]: Charlene Fale

....

THE COURT: [Mr. Prosecutor], this is a witness. He says he's not been previously apprised.

[PROSECUTOR]: Your Honor, in the complaining witness's statement she writes that after she was allegedly sexually assaulted by [Crisostomo] she jumped over the fence and went to her neighbor's house. Charlene Fale is that neighbor that she went to.

And basically Charlene Fale is also the person that the complaining witness spoke to about this right after it happened. And Charlene told her to tell her father. And Charlene was with her earlier in the day when [Crisostomo] was over the house.

THE COURT: So is there—reference in any of the discovery to the name Charlene Fale?

[DEFENSE COUNSEL]: That's correct, Your Honor.

THE COURT: All right. But there is reference to the neighbor.

[PROSECUTOR]: Yes.

The trial court then proceeded to inquire as to the contents of Fale's testimony. The prosecution explained that Fale would testify that she was with Complainant earlier in the day, that Crisostomo was present, and that Complainant came to her crying about what happened afterwards. Additionally, Fale would testify that she had seen Crisostomo at Complainant's home on numerous occasions and had observed him looking at Complainant in the way one would "look[ ] ... across the room at somebody else in a club that you're trying to pick up." The trial court ultimately ruled that the proffered testimony was inadmissible. The court also denied the prosecution's request to allow Fale to testify as to Complainant's demeanor the morning following the alleged incident because several hours had elapsed between when the alleged incident occurred and when Complainant told Fale about the incident; Fale's observations were too remote in time and therefore irrelevant.

However, prior to jury selection on the first day of trial, the prosecution made the following correction for the record:

[PROSECUTOR]: ... In regard to the defense motion in limine regarding the surprise witness that—Charlene Fale, I didn't have my notes with me when we did the motion in limine. ... So when I went back to my office I did review my notes. And in regard to the first, there's a tape that the defense got. It's a Children's Advocacy Center interview tape.

In that tape the complaining witness in this case disclosed the name Charlene Fale. That's the first person she told. That's her neighbor. That's the house that she went to. So just on the fact that this was a surprise witness, which I know was one of the reasons why we were discussing Charlene Fale, this was in no way a surprise witness. The defense got that information.

Nevertheless, I understand the Court's ruling in regarding some of the testimony by Charlene Fale may not be relevant. However, I would still just ask the Court

that it be open to maybe having her in rebuttal, depending upon what's brought up by the defense's case. I didn't want her to be just barred exclusively.

THE COURT: All right. Yes. Thank you. ... *The defense did refer to her as a surprise.* So the record reflects that she may not necessarily be a surprise if he's reviewed discovery. But nonetheless, *the Court's ruling is based on relevance.* And certainly you may be entitled to call her as a rebuttal witness, should that whatever evidence suggest that that is necessary to bring her in. I have no problem with that.

(Emphases added.)

At trial, Complainant testified on direct as follows. Crisostomo and Complainant's father were good friends. On August 8, 1997, Crisostomo and his brother-in-law were at Complainant's house drinking with her father. Complainant's father then left for work, and Crisostomo and his brother-in-law left soon thereafter. Later, at approximately 3:30 a.m., while Complainant was on the couch watching television, Crisostomo and his brother-in-law returned with a woman named "Martha," and "they were drunk." Crisostomo's brother-in-law and Martha went to another room, while Crisostomo stayed with Complainant. Crisostomo began to fondle Complainant by placing his hand on her breast, vagina, and buttocks. After several unsuccessful attempts to stop him, Complainant ran out of the house and hid in her friend's, Charlene Fale's, garage across the street for nearly two hours. Complainant testified that she did not immediately enter Fale's house because she believed Fale's mother would be angry at her for jumping over the Fales' already broken fence to get to the garage.

The next day, Complainant told Fale and Fale's mother about the incident but was afraid to inform her father. Fale's mother told Complainant that, if Complainant did not inform her father, Fale's mother would. Complainant, therefore, subsequently informed her father, and he and Complainant reported the incident to the police.

On cross-examination, defense counsel questioned Complainant about the fact that she did not go into the Fales' house:

Q: [By Defense Counsel] Okay. And your friend, Charlene, and her mom, do you know them pretty well?

A: [By Complainant] Yeah.

Q: Have you ever been over to Miss Fale's house?

A: Yeah.

Q: And you know her mom?

A: Yeah.

Q: And are you on friendly terms with her?

A: Yeah.

Q: And on that night you didn't go into her house?

A: Who?

Q: Miss Fale's house?

A: No.

Q: You didn't. Do you know whether or not she has a door bell?

A: I don't know.

Q: Okay. So you didn't try to use a door bell?

A: No.

Q: You didn't try to knock on any windows?

A: Nope.

Q: You didn't yell or scream or anything at Miss-to Miss Fale, try to draw attention?

A: No.

Q: And you waited in her yard for an hour and a half?

A: The garage. The hour and a half, I don't know how long.

Q: Oh, okay. Until about 5:00?

A: Uh-huh.

After Complainant testified, the prosecution, outside the presence of the jury, moved to have Fale testify about the rule against climbing over the Fales' fence [the fence rule]. The prosecution maintained that Fale's testimony was relevant to show, *inter alia*, that Complainant was afraid to enter the Fales' home immediately after the incident because she had violated the fence rule. Defense counsel objected on the grounds that Fale's testimony regarding the fence would be cumulative. Over defense counsel's objection, the trial court ruled that the testimony was relevant. In so ruling, the court distinguished the proposed testimony regarding the fence rule from the proposed testimony that it had previously ruled inadmissible.

When asked about the fence rule, Fale testified that Complainant had jumped over the fence a couple times when she had come over to Fale's house and that the top of the fence had begun to get "dented down." Fale then stated, "[My mom] told [Complainant] not to climb the fence anymore." In response to the prosecutor's question regarding whether the rule had changed, Fale stated, "Yeah. After the incident, mom told her if anything else happened at their house, if anything was going on, if she needed help, to just hop over the fence." Defense counsel did not object at any point during Fale's testimony regarding the fence rule. On cross-examination of Fale, defense counsel asked, "And your mom would . . . get upset if she jumped over the fence?" to which Fale responded, "Yeah. That's the only time she'd get mad."

In addition to his brother-in-law, Crisostomo testified on his own behalf. Crisostomo corroborated Complainant's testimony that he and his brother-in-law had been drinking at Complainant's home with her father, but left soon after her father left for work. Crisostomo testified that, after leaving, he and his brother-in-law went to a park and continued drinking until approximately 3:00 a.m. Thereafter, Crisostomo and his brother-in-law returned to Complainant's home to get more beer. From this point, Crisostomo's version of what followed differed from Complainant's version.

According to Crisostomo, neither he nor his brother-in-law were accompanied by a woman named "Martha." Upon returning to Complainant's home, Crisostomo testified that Complainant had been drinking with male friends at the house and that she was "buzzed." Crisostomo testified that he "scolded" Complainant about breaking her father's rules against boys being in the home and drinking alcohol. Crisostomo testified

that he had "[n]ever looked at [Complainant] in any sexual way." Crisostomo also testified that he was not aware of Complainant's accusations of sexual assault until the next day. Following Crisostomo's testimony, the defense rested. The jury found Crisostomo guilty as charged.

Crisostomo timely appeals.

## II. STANDARDS OF REVIEW

### A. Excusing Jurors

 A trial court's determination to excuse a juror is reviewed on appeal for an abuse of discretion. *See State v. Jones*, 45 Haw. 247, 262, 365 P.2d 460, 468 (1961). This court has also stated, however, that "[u]nless it patently appears that such discretion has been abused and that the defendant has not been given a fair trial resulting from the abuse, an appellate court will not interfere with the exercise of judicial discretion." *Id.* (holding that the court's sua sponte dismissal of a potential juror for cause without explanation was proper where the "cause" was obvious from the juror's responses to questioning during voir dire). "Generally, to constitute an abuse[,] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Gaylord*, 78 Hawai'i 127, 144, 890 P.2d 1167, 1184 (1995) (quoting *State v. Kumukau*, 71 Haw. 218, 227–28, 787 P.2d 682, 688 (1990)).

### B. Admissibility of Evidence

 [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. The requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result. HRE Rule 802 (1993) provides in pertinent part that "[h]earsay is not admissible except as provided by these rules[.]" ... Thus, where the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and "the appropriate standard for appellate review is the right/wrong standard."

*State v. Moore*, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996) (internal citations omitted) (quoting and citing *Kealoha v. County of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993)).

## III. DISCUSSION

### A. Dismissal of juror

██ Crisostomo argues that the trial court erred when it sua sponte dismissed juror Luis without sufficient cause or consultation with counsel. Additionally, Crisostomo appears to argue that he was prejudiced because a female juror (juror Madlener) replaced a male juror (juror Luis) in this sex assault case, which already had a predominantly female jury.

Hawai'i Rules of Penal Procedure (HRPP) Rule 24(c) (1996)[3] provides the trial court with the discretion to replace jurors who are unable to perform their duties or who are disqualified. Substitution of a juror with an alternate, based on the failure of a juror to appear in court, has never been clearly examined in Hawai'i case law. Because HRPP Rule 24(c) is nearly identical to its federal counterpart, *i.e.*, Federal Rules of Criminal Procedure (FRCrP) Rule 24(c) (1999),[4] this court may look to parallel federal law for guidance. *See Shaw v. North American Ti-*

---

**3.** HRPP Rule 24(c) provides in pertinent part that "[t]he court may direct that not more than four jurors in addition to the regular jury be called and impaneled to sit as alternate jurors who shall, in the order in which they are called, replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties[.]"

**4.** FRCrP Rule 24(c) provides in pertinent part that "[t]he court may empanel no more than six jurors, in addition to the regular jury, to sit as alternate jurors. An alternate juror, in the order called, shall replace a juror who becomes or is found to be unable or disqualified to perform juror duties[.]"

*tle,* 76 Hawai'i 323, 326, 876 P.2d 1291, 1294 (1994).

Under federal case law interpreting FRCrP Rule 24(c), the trial court, in its sound discretion, may remove an absent juror and substitute an alternate juror "whenever facts are presented which convince the trial judge that the juror's ability to perform his [or her] duty as a juror is impaired." *United States v. Rodriguez,* 573 F.2d 330, 332 (5th Cir.1978) (holding that replacing an absent juror with an alternate was not a prejudicial abuse of discretion); *see also, e.g., United States v. Alexander,* 48 F.3d 1477, 1485 (9th Cir.1995) (holding that the trial court did not err in replacing a juror who was absent due to child's illness); *United States v. Peters,* 617 F.2d 503, 505 (7th Cir. 1980) (holding that the trial judge did not act improperly in replacing a juror who was not present five minutes after the designated arrival time); *cf. State v. Nupeiset,* 90 Hawai'i 175, 178–79, 977 P.2d 183, 186–87 (App. 1999) (stating that the "paramount question in determining whether to excuse for cause a : . . juror is whether the defendant would be afforded a fair and impartial trial . . . [if the juror is not removed]"). In addition, under federal law, an appellate court will not disturb a trial court's decision to replace a juror under FRCrP Rule 24(c) without a showing of bias or prejudice to a defendant. *See Smith,* 550 F.2d at 285; *see also Rodriguez,* 573 F.2d at 332; *United States v. Alexander,* 48 F.3d 1477, 1485 (9th Cir.), *cert. denied,* 516 U.S. 878, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995); *United States v.. Agramonte,* 980 F.2d 847, 850 (2d Cir.1992); *United States v. Peters,* 617 F.2d 503, 505 (7th Cir.1980).

In *Peters,* the United States Court of Appeals for the Seventh Circuit specifically addressed whether the trial court abused its discretion when it replaced a juror, who was ten minutes late, with an alternate on the last day of trial. *Peters,* 617 F.2d at 504–05. The court in *Peters* noted that the trial court had clearly informed the jury the previous day that "the [trial] would commence the following day at 10:00 a.m. and that the jurors should be 'in the jury room shortly before 10:00 o'clock tomorrow morning.' " *Id.* at 505. Thus, the Seventh Circuit court

held that the trial court did not abuse its discretion when it replaced the juror without conducting an inquiry into the juror's whereabouts because it was reasonable for the trial court to believe that such an inquiry would have been "unavailing or too disruptive to undertake on the last day of trial." *Id.* Moreover, the Seventh Circuit court noted that a juror's failure to appear is a "complete disqualification" under FRCrP Rule 24(c) that obviates the need for such an inquiry. *See id.* Finally, the court observed that the defendant had not demonstrated prejudice resulting from the juror substitution because (1) the defendant failed to even allege prejudice on appeal and (2) the defendant's failure to object at trial impliedly suggested that there would not be any prejudice caused by the substitution. *Id.* at 505.

Analogously, the United States Court of Appeals for the Fifth Circuit, in *Rodriguez,* dealt with the trial court's replacement of a juror who had informed the court that he would be attending work, rather than returning to court, that day. *Rodriguez,* 573 F.2d at 332. Regarding the juror's absence, the court in *Rodriguez* stated:

A juror's absence is an observable fact. His absence manifestly interferes with the prompt trial of a case. Hence when a juror is absent from court for a period sufficiently long to interfere with the reasonable dispatch of business there may be a "sound" basis for his dismissal.

*Id.* The defendant in *Rodriguez* argued that he was prejudiced because a black juror had been replaced with a white juror. *Rodriguez,* 573 F.2d at 332–33. The Fifth Circuit court held that the replacement of a black juror with a white juror, in and of itself, did not amount to the kind of prejudice that would warrant a reversal of the trial judge's discretion. *See id.*

In the present case, juror Luis was instructed by the trial court during jury selection and at the end of the first court day to appear for trial the following morning at nine o'clock. Nevertheless, juror Luis failed to appear at the appointed time, and the record reflects that at 9:20 a.m., when the court replaced juror Luis with the alternate, (1) Luis was still in Ewa Beach, (2) the proceed-

ings would be further delayed if the court waited for him, and (3) all of the other jurors, including the alternate, were present. Thus, it appears that the trial court had a "sound basis" for dismissing juror Luis. *See Rodriguez,* 573 F.2d at 332.

■ The analysis, however, does not end there. Adopting the reasoning of the foregoing federal courts, we must next examine whether Crisostomo was prejudiced by the trial court's decision to replace juror Luis with juror Madlener. Although inartfully argued, Crisostomo appears to contend that, because the male-female ratio on the jury was changed as a result of replacing a male juror with a female juror, he was somehow denied his right to a fair trial. Crisostomo's unsupported contention, however, is clearly contradicted by his counsel's own words. As previously indicated, at the time juror Luis was replaced, defense counsel indicated on the record that he "believe[d] that [the alternate] could also be a fair juror in this case" and that he "did not have any problems with her." *See Agramonte,* 980 F.2d at 850 (rejecting defendant's argument that the trial court erred in dismissing a juror because "[the defendant] ma[de] no assertion[ ] that he suffered bias or prejudice and d[id] not claim the alternate juror ... was not impartial").

■ Without citation to any authority, Crisostomo also contends that it is "presumptively prejudicial" for a trial court to replace a male juror with a female alternate in a sexual assault case involving a minor female. The mere replacement of a male juror with a female juror may be likened to the replacement of the black juror with the white juror in *Rodriguez.* Without more, the gender or race of a juror, in and of itself, cannot reasonably be said to amount to the type of prejudice that would warrant reversal of the trial judge's discretion. *See Rodriguez,* 573 F.2d at 332–33. *Cf. State v. Levinson,* 71 Haw. 492, 795 P.2d 845 (1990) (holding that the use of peremptory challenges in a criminal case to exclude female jurors solely on the basis of gender violates the equal protection clause of the Hawai'i Constitution). Thus, we reject Crisostomo's "presumptively prejudicial" argument.

Accordingly, because there are sufficient facts demonstrating that juror Luis was unable to fulfill his duties, and Crisostomo failed to demonstrate prejudice, we hold that the trial court did not abuse its discretion by replacing male juror Luis with female alternate juror Madlener.

### B. *Witness' Testimony*

Crisostomo next contends that the trial court erred when it allowed Fale to testify because (1) allowing Fale to testify over a prior court ruling violated the "law of the case" doctrine and (2) her testimony regarding statements made by Fale's mother constituted inadmissible hearsay. We disagree.

■ Crisostomo's first argument is based upon the court's ruling on Crisostomo's motion in limine to exclude, *inter alia,* "surprise witnesses." Crisostomo contends that, because the court had previously prohibited Fale's testimony, the court departed from the "law of the case" when it subsequently admitted Fale's allegedly hearsay testimony over his objection.

"The phrase 'law of the case' has been used, *inter alia,* to refer to 'the usual practice of courts to refuse to disturb all prior rulings in a particular case, including rulings made by [that same judge].' " *Chun v. Board of Trustees of Employees' Retirement System of the State of Hawai'i,* 92 Hawai'i 432, 441, 992 P.2d 127, 136 (2000) (quoting *Wong v. City and County of Honolulu,* 66 Haw. 389, 396, 665 P.2d 157, 162 (1983)). The law of the case doctrine is inapposite to this case because the trial court never ruled that Fale's testimony regarding the fence rule was inadmissible.

At the hearing on Crisostomo's motion in limine, the only testimony proffered by the prosecution was that Fale was with Complainant earlier in the day, while Crisostomo was present, and that Complainant came to her crying about what happened afterwards. The trial court ruled that the *proffered* testimony was inadmissible.

Additionally, prior to the beginning of trial, on November 18, 1998, after the prosecution explained to the court that Fale's name had,

in fact, been provided to Defense counsel in discovery, the trial court stated that Fale "may not necessarily be a surprise [witness]" and that "the court's [previous] ruling [was] based on relevance." The trial court also stated that the prosecution would be entitled to call Fale as a rebuttal witness should the evidence suggest that Fale's testimony would be necessary. Furthermore, at no time was potential testimony regarding the Fales' gate or the fence rule proffered to the trial court and nothing in the previous rulings of the court precluded Fale's testimony on other issues.

 Crisostomo next contends that the testimony elicited from Fale was inadmissible hearsay. However, Crisostomo did not object during trial to the allegedly hearsay statements. A hearsay objection not raised or properly preserved in the trial court will not be considered on appeal. *MPM Hawaiian, Inc. v. Amigos, Inc.*, 63 Haw. 485, 487, 630 P.2d 1075, 1077 (1981) (citing *Low v. Honolulu Rapid Transit Co.*, 50 Haw. 582, 585, 445 P.2d 372, 376 (1968)). This is true even where the testimony is objected to on other grounds. *See, e.g., Low*, 63 Haw. at 487, 630 P.2d at 1077 (holding that hearsay objection was waived where counsel only objected based on parole evidence rule). Accordingly, we hold that Crisostomo waived the hearsay argument with respect to Fale's testimony.

Even if the hearsay argument had not been waived, it is not necessary to determine whether Fale's statements regarding what her mother said to Complainant constituted hearsay because any error in their admission was harmless. Fale's statements of what her mother said were merely cumulative of Complainant's statements and Fale's other non-hearsay testimony regarding the fence rule. *See, e.g., State v. Clark*, 83 Hawai‘i 289, 298, 926 P.2d 194, 203 (holding that any error in admitting witness testimony was harmless where similar statements had been properly presented to the jury and were merely cumulative of admissible testimony), *reconsideration denied*, 83 Hawai‘i 545, 928 P.2d 39 (1996).

## IV. CONCLUSION

Based upon the foregoing, we affirm Crisostomo's conviction and sentence.