129 P.3d 1182

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jonathan ASUNCION, Defendant–Appellant.**

**No. 26397.**

Intermediate Court of Appeals of Hawai'i.

Feb. 15, 2006.

---

**9.** *State v. Kuuku,* 61 Haw. 79, 80–81, 595 P.2d   291, 293 (1979).

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, for defendant-appellant.

Stephen K. Tsushima, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

LIM, Acting C.J., FOLEY and NAKAMURA, JJ.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Jonathan Asuncion (Asuncion) appeals from the Judgment of Conviction and Sentence filed on January 14, 2004 in the Family Court of the First Circuit (family court).[1] A jury found Asuncion guilty of Abuse of Family or Household Members, in violation of Hawaii Revised Statutes (HRS) § 709–906 (Supp.2005),[2] and the family court sentenced Asuncion to one year of imprisonment.

1. The Honorable Reynaldo D. Graulty presided.

2. Hawai'i Revised Statutes (HRS) § 709–906 (Supp.2005) provides:

> **§ 709–906 Abuse of family or household members; penalty.** (1) It shall be unlawful for any person, singly or in concert, to *physically abuse* a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.
>
> For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.
>
> (2) Any police officer, with or without a warrant, may arrest a person if the officer has reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member and that the person arrested is guilty thereof.
>
> (3) A police officer who has reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member shall prepare a written report.
>
> (4) Any police officer, with or without a warrant, may take the following course of action where the officer has reasonable grounds to believe that there was physical abuse or harm inflicted by one person upon a family or household member, regardless of whether the physical abuse or harm occurred in the officer's presence:
>
> (a) The police officer may make reasonable inquiry of the family or household member upon whom the officer believes physical abuse or harm has been inflicted and other witnesses as there may be[.]
>
> . . . .
>
> (5) Abuse of a family or household member and refusal to comply with the lawful order of a police officer under subsection (4) are misdemeanors[.]
>
> . . . .

On appeal, Asuncion claims the family court prejudicially erred in admitting evidence of his prior acts of domestic violence against his girlfriend (Girlfriend) on April 16, 1997, December 4, 2000, and December 10, 2000 because that evidence was irrelevant and inadmissible under Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp.2005) [3] and unnecessary and unduly prejudicial under HRE Rule 403 (1993).[4] We disagree and affirm.

> Upon conviction and sentencing of the defendant, the court shall order that the defendant immediately be incarcerated to serve the mandatory minimum sentence imposed; provided that the defendant may be admitted to bail pending appeal pursuant to chapter 804. The court may stay the imposition of the sentence if special circumstances exist.
>
> . . . .
>
> (9) The family or household member who has been physically abused or harmed by another person may petition the family court, with the assistance of the prosecuting attorney of the applicable county, for a penal summons or arrest warrant to issue forthwith or may file a criminal complaint through the prosecuting attorney of the applicable county.
>
> (Emphasis added.)

3. Hawai'i Rules of Evidence (HRE) Rule 404 (Supp.2005) provides in relevant part:

> **Rule 404 Character evidence not admissible to prove conduct; exceptions; other crimes.**
>
> . . . .
>
> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

4. HRE Rule 403 (1993) provides:

> **Rule 403 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of

## I.

On July 7, 2003, Asuncion was charged by complaint with Abuse of Family or Household Members. The complaint alleged that on January 27, 2003 Asuncion *physically abused* Girlfriend, a family or household member. On October 7, 2003, the State filed its Notice of Intent to Use Evidence. Specifically, the State sought to introduce at trial, pursuant to HRE Rule 404(b) and *State v. Clark,* 83 Hawai'i 289, 926 P.2d 194 (1996), three prior police reports of abuse by Asuncion against Girlfriend. The State proffered the three reports as evidence of other incidents where Asuncion had threatened, harassed, or abused Girlfriend to provide a possible explanation for Girlfriend's recanta-

tion at trial and as evidence of Asuncion's intent, motive, modus operandi, and lack of mistake or accident.

On January 8, 2004, prior to the start of trial, the family court held a hearing on the State's and Asuncion's motions in limine. The family court considered Asuncion's attorney's request that the court preclude the use of Asuncion's prior criminal record at trial. The State asserted that it would seek to allow into evidence Asuncion's three prior convictions for Abuse of Family or Household Members "pursuant to foundations laid under [HRE] 404B [sic] and *State v. Clark.*" [5]

Asuncion's attorney then discussed the application of *Clark* to the case at bar. Asuncion's attorney noted that the family court

---

time, or needless presentation of cumulative evidence.

5. In *State v. Clark,* 83 Hawai'i 289, 926 P.2d 194 (1996), Clark was charged with Attempted Murder in the Second Degree for stabbing his wife, Diana. *Id.* at 291–92, 926 P.2d at 196–97. At trial, Diana's testimony differed greatly from what she had told a detective and others about the incident. *Id.* at 292, 926 P.2d at 197. Diana stated that her original story had been "a total lie." *Id.* at 293, 926 P.2d at 198. Whereas her original story had implicated Clark, her testimony on the stand completely exculpated him. *Id.*

During the trial, the State asked Diana about two prior times the police had been called to her home in response to arguments between Clark and her. *Id.* In the first incident, the police were called to the couple's residence after Diana had been injured during an argument with Clark. *Id.* After the incident, Diana contended that Clark had not injured her. *Id.* In the second incident, the police were called to the couple's residence after the couple had quarreled. *Id.* Although Clark had caused substantial damage to the couple's property during the altercation, Diana initially lied to the police and told them a burglar had done the damage. *Id.* Diana later admitted, however, that Clark had done it. *Id.*

Among that of other witnesses, the State presented the testimony of an expert on domestic violence. *Id.* The expert testified that domestic violence victims often recant allegations of abuse against their abusers. *Id.*

A jury found Clark guilty as charged, and Clark was sentenced to a life term of imprisonment with the possibility of parole. *Id.* Clark appealed, arguing, in part, that the trial court erred by allowing the State to question Diana regarding the two prior incidents, which should have been precluded under HRE Rule 404(b) or Rule 403. *Id.* at 299, 926 P.2d at 204.

The Hawai'i Supreme Court first considered the relevance of the evidence. *Id.* at 300, 926

P.2d at 205. The court held that "where a victim recants allegations of abuse, evidence of prior incidents of violence between the victim and the defendant are relevant to show the trier of fact the context of the relationship between the victim and the defendant, where . . . that relationship is offered as a possible explanation for the victim's recantation." *Id.* at 302, 926 P.2d at 207.

The supreme court then weighed the probative value of the evidence against its prejudicial effect. *Id.* at 303, 926 P.2d at 208. It held that "[t]he *Castro* court's emphasis on the need for the evidence warrants the admission of the evidence at issue in the present case." *Id.* The supreme court was referring to the dicta set forth in *State v. Castro,* 69 Haw. 633, 756 P.2d 1033 (1988), when it stated:

In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value [of evidence], a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, *the need for the evidence*, the efficacy of alternative proof, and the degree to which the evidence probably will arouse the jury to overmastering hostility.

*Castro,* 69 Haw. at 644, 756 P.2d at 1041 (emphasis added) (citing E.W. Cleary, *McCormick on Evidence* § 190 (3d ed.1984)).

*Clark,* 83 Hawai'i at 303 n. 4, 926 P.2d at 208 n. 4 (emphasis in original). The court held that "where the complaining witness recants his or her pre-trial accusation against the defendant, evidence of prior acts of domestic violence involving the complaining witness and the defendant is admissible, subject to the HRE 403 balancing test, to show the jury the context of the relationship between the victim and the defendant, where the relationship is offered as a possible explanation for the complaining witness's recantation at trial." *Id.* at 303, 926 P.2d at 208.

would probably be inclined to admit evidence of Asuncion's prior convictions to show the context of Asuncion and Girlfriend's relationship if Girlfriend were to recant her prior written statement to Honolulu Police Department Police Officer Toledo (Officer Toledo) at trial. However, Asuncion's attorney contended the holding in *Clark* was limited to situations in which the complaining witness had recanted the prior incidences of violence, in addition to recanting at trial. Asuncion's attorney also distinguished the instant case with *Clark* by pointing out that in *Clark* an expert witness [6] was used to demonstrate the context of the relationship between a defendant and a complaining witness.

The State countered that the Hawai'i Supreme Court in *Clark* had stated no expert witness was required to prove that a defendant and complaining witness had an abusive relationship. The State explained that if Girlfriend were to try to characterize herself as the first aggressor or if she were to protectively lie for Asuncion about whether their relationship was abusive, Asuncion's prior convictions should be allowed so the jury could consider the context of the relationship between Girlfriend and Asuncion.

The family court observed that "the question might be more precisely whether or not the variation in the accounts being made by the complaining witness amount[s] to her recantation," which was sometimes difficult to ascertain. The family court clarified that it would let in .evidence of Asuncion's prior convictions if Girlfriend were to recant at trial, not to show that Asuncion and Girlfriend had an abusive relationship—i.e., to prove the truth of the matter asserted—but to demonstrate the context of their relationship and explain why Girlfriend might be recanting.

Officer Toledo testified that on January 27, 2003 he responded to a call dispatching him to an apartment on Wilikina Drive. When he arrived at the apartment, Girlfriend and a teenage girl and boy were there. Officer Toledo asked Girlfriend what happened, and she told him that her boyfriend had punched her in the face several times because she was

trying to stop him from taking the Playstation out of the house.

Officer Toledo testified that Girlfriend's "hair was all messed up," "her eyes were puffy and red," her nose was red, she had a trembling voice, she appeared scared, and she had a redness to her left cheek. Officer Toledo documented in his report the fact that Girlfriend had redness to her left cheek, and he took a photograph of her. Officer Toledo asked Girlfriend to write and sign a statement, which she did.

On cross-examination, Officer Toledo admitted that "the red and puffy eyes, the red noise [sic], [and] the trembling voice" probably could have been indications that Girlfriend had been merely crying. He testified it was possible that the redness to Girlfriend's cheek could have been from blowing her nose or rubbing her eyes. Officer Toledo testified that he did not observe any bruises, bumps, or scratches on Girlfriend's face, only redness. On redirect, Officer Toledo testified that Girlfriend told him she had gotten the redness to her left cheek from her boyfriend punching her in the face.

Officer Toledo also testified that as part of his investigation he interviewed Girlfriend's son (Son). Son dictated his "HPD 252 statement" to his sister, Girlfriend's daughter (Daughter), who wrote it for him in Officer Toledo's presence. Officer Toledo conceded he did not know whether Daughter had written down Son's statement "word for word verbatim." Daughter had not witnessed the incident between Asuncion and Girlfriend.

Daughter testified that Asuncion was the boyfriend of her mother (Girlfriend) and on January 27, 2003 Girlfriend and Asuncion were arguing. The fight led to physical hitting. Daughter left the house to call the police from a neighbor's phone. Police officers arrived about fifteen minutes after Daughter returned home. Daughter told the police she wanted to make a report, but the police said she could not make a report because she had not been there the whole time. Daughter testified that Son told her the "whole story," she wrote his statement down word-for-word, and Son did not write his own

---

6. A domestic violence expert. *Clark,* 83 Hawai'i at 293, 926 P.2d at 198.

statement because he had a hard time spelling. Daughter testified that if there were a dispute between Girlfriend and Asuncion, it was safe to say she would side with Girlfriend.

Son testified that on January 27, 2003 his mother (Girlfriend) and Asuncion were arguing about the fact that Asuncion was trying to take the Playstation. Girlfriend said to "leave it for the family." Son first testified he did not observe the fighting, but he later stated that he had misspoken and he did see physical fighting. He testified that Asuncion had a bag and was trying to leave when the argument turned physical. Asuncion was at the door when Girlfriend grabbed the bag Asuncion was carrying and tried to pull it away from Asuncion and Asuncion punched Girlfriend. Son testified that Girlfriend and Asuncion then went into their bedroom. While Asuncion and Girlfriend were in the bedroom, Son saw Asuncion again punch Girlfriend once or twice on the left side of her cheek with a closed fist.

Son testified that after Girlfriend got punched in the face, she "had the scissors to defend herself" and Asuncion got scared, so Son "grabbed the scissors away." Asuncion then left. Asuncion never got stabbed or poked with the scissors. After Asuncion left, Girlfriend was crying. She was mad when Asuncion left, and she was still mad when the police arrived.

Son testified that Daughter wrote down word for word his statement for him to give to the officer and he read the statement and signed it. He testified that when Asuncion and Girlfriend argued, it was fair to say he was pretty much on Girlfriend's side.

Girlfriend testified that on January 27, 2003 Asuncion was her boyfriend and they were living together at Wilikina Drive. The evening of the 27th, she and Asuncion began arguing. After the argument, Asuncion said he was leaving and taking his things. He tried to walk out the door, which made Girlfriend even more mad. Girlfriend did not want Asuncion to leave, so she pulled his hair and tried to stop him from taking his Playstation. She testified that she got him around the neck, then "pulled him back and then he

. . . hit me in the head too, I guess push me away."

The Prosecutor asked Girlfriend about the physical altercation:

**Q [PROSECUTOR]** He hit you on the head?

**A [GIRLFRIEND]** Yeah, right here this side.

**Q** What happened after he hit you on the head?

**A** I yanked his playstation out. Oh, no, he just threw it and I took it and went in the room, then he left.

**Q** How did he hit you in the head?

**A** I don't know.

**Q** Open-hand first or closed-hand fist?

**A** I neva see. I was in a struggle. I had him around and he was like, trying to get away from me.

**Q** Did the hit to your head cause you any pain?

**A** Not at the moment. I was angry, and after, yeah, it was sore.

**Q** Pardon me?

**A** At the moment, it wasn't cause I was angry and *I didn't feel nothing.*

**Q** But you did feel pain?

**A** The next day, yeah.

**Q** How about when—well, did the officers come?

**A** Um, umm.

**Q** *Did you feel pain when the officers were there?*

**A** *No.*

**Q** You didn't. Do you remember what time the police arrived?

**A** About maybe 6:50, around there, yeah.

**Q** And did he hit you anymore times besides hitting you in the head?

**A** No.

**Q** When the police arrived, did you write a statement?

**A** Yes.

**[PROSECUTOR]:** Your Honor, may the record reflect that I'm showing defense counsel what has been marked as, for iden-

tification purposes, State's Exhibit Number 4. May I approach the witness?

**THE COURT:** Very well, you may approach.

**Q** [PROSECUTOR]: [Girlfriend], I'm showing you what's been marked for identification purposes State's Exhibit 4.[7] Do you recognize this?

**A** Yes.

**Q** And what is this?

**A** My statement I wrote.

**Q** How do you recognize it?

**A** My writing, my name.

**Q** And that's your signature at the bottom?

**A** Yes.

**Q** And do you remember telling the officer that you got punched in the right side temple and left cheek?

**A** Yeah.

**Q** *And do you remember telling the officer that you felt pain on both sides of your face and neck?*

**A** *No, I neva—he asked me if I felt pain, and he told me to write that I had pain.*

**Q** He told you to write that?

**A** Yeah, and he also told me to write I would prosecute.

**Q** *But you did feel pain?*

**A** *No,* at the time I was angry.

[PROSECUTOR]: Your Honor, at this time, the State is going to ask that what's been marked as State's Exhibit 4 for identification purposes be moved into evidence?

**THE COURT:** Any objections?

[PROSECUTOR]: (indiscernible)

**THE COURT:** Any objections, [Defense Counsel]?

[DEFENSE COUNSEL]: Yes, your Honor, lack of foundation.

**THE COURT:** The Court is going to admit into evidence over defense's objec-

tions the proposed exhibit number 4 and mark it State's number 4. You may continue.

[PROSECUTOR]: Thank you, your Honor.

. . . **Q** [Girlfriend], do you still live with the defendant?

**A** Yes.

**Q** And you still love him, don't you?

**A** Yes.

**Q** And he's the father of your two young children?

**A** Yes.

**Q** And you don't wanna see anything bad happen to him, do you?

**A** No, I just want help for both of us, counseling.

(Emphasis added.)

After the above testimony, the family court excused the jury and heard argument regarding the introduction of prior bad acts evidence. The State explained that, in addition to the 2000 and 2001 convictions, Asuncion had been convicted of Abuse of Household or Family Members on June 2, 1997. At the time of the June 2, 1997 conviction, Asuncion and Girlfriend had been living together.

The family court stated that

because the purpose for allowing the prior incidents and convictions is to provide the jury with the context of the relationship and the relationship was in existence at the time, the Court is going to allow the reference to the June 2, 1997, conviction to be brought before the jury.

The State then clarified that "for the purposes of *Clark* . . ., the State would be seeking to admit . . . the testimony regarding the prior incidences of the abuses [sic], but not the convictions."

The family court agreed, stating that, according to the holding in *Clark*, "it is the

---

7. The statement Defendant–Appellant Jonathan Asuncion's girlfriend (Girlfriend) wrote for the police and signed on January 27, 2003 read as follows:

On this day Jan. 27, 2003, at 6:40 p.m. my boyfriend Jonathon [sic] Asuncion punch the right side tempo [sic], and punched my left

chick [sic]. I felt pain on both side [sic] of my face and head. Jonathon [sic] Asuncion is the father of my last 2 children. We been together for the past 7 yr. This inci[dent] happien [sic] at my house at . . . Wilikina Dr. . . . Wahiawa HI, 96786. I am willing to prosecute.

prior acts of domestic violence, not the convictions that is [sic] admissible at this point." The family court went on to note:

The Court has, however, to accomplish a balancing test to see whether the danger of unfair prejudice substantially outweighs the probative value of the evidence of the prior acts of domestic violence in this case, and *Clark* again is instructive.

Relying on *[State v. ]Castro* [, 69 Haw. 633, 756 P.2d 1033 (1988) ],[8] the importance of the need factor when weighing probative value versus prejudicial effect under 404–B [sic], and the court in *Clark* said, the *Castro* Court emphasis on the need for the

evidence warrants the admission of the evidence at issue in the present case.

And the need factor is highlighted in the [reference to *Castro* ] in Footnote Number 4 [in *Clark* [9]].

. . . .

The Court in balancing the factors that *Clark* requires it to do in this case is going to find that the need for the evidence is great and, therefore, weighing the probative value of the evidence versus the prejudicial effect, the Court is going to allow the prior evidence . . . of . . . all three acts of domestic violence for the purpose of showing the jury the context of the relationship between the victim and the defendant

**8.** In *State v. Castro*, 69 Haw. 633, 756 P.2d 1033 (1988), Castro was charged with Attempted Murder and Assault in the First Degree for grabbing his girlfriend by the hair and stabbing her repeatedly in the back and neck with a knife. *Id.* at 639–40, 756 P.2d at 1039. Before trial, the State served notice of its intention to enter into evidence testimony concerning Castro's prior acts of violence. *Id.* at 640, 756 P.2d at 1039. The State contended this evidence was admissible pursuant to HRE 404(b) since it was probative of Castro's state of mind at the time he committed the offenses. *Id.* Castro responded with a motion in limine that the testimony should be excluded since it was being offered to prove his character in order to show that he acted in conformity therewith on the occasion in question. *Id.* (quotation marks and brackets omitted). The trial court found the evidence was relevant, *id.*, in establishing intent, preparation, plan, knowledge, and modus operandi, *id.* at 644, 756 P.2d at 1041–42, and its probative value outweighed any prejudicial effect it could have. *Id.* at 640–41, 756 P.2d at 1039.

When Castro's girlfriend testified, she described incidents, prior to the stabbing that had given rise to the case at bar, in which Castro had slapped and punched her, threatened her while wielding a knife, threatened her over the telephone, held a gun to her head, and raped her. *Id.* at 641, 756 P.2d at 1040–41.

On appeal, the Hawai'i Supreme Court held that the lower "court erred when it . . . admitted evidence of the defendant's aggressive and violent character." *Id.* at 638, 756 P.2d at 1038. In its dicta, the court noted that if the evidence is probative of any . . . fact of consequence in the determination of the case, the court must then consider whether the prejudicial impact of the evidence would be substantially greater than its probative worth. And

[i]n deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the

commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

[E.W. Cleary, *McCormick on Evidence* § 190 (3d ed.1984).]

*Castro*, 69 Haw. at 644, 756 P.2d at 1041. The court then stated that the introduction of Castro's prior bad acts in the instant case could not be "justified on the basis of need or the inefficacy of alternative proof. For there was much more from which an inference of intentional conduct could be drawn in the evidence of the offense for which the defendant was being tried." *Id.* The court commented that "[t]here was even less justification to deem the evidence in question relevant on grounds that it showed preparation, plan, knowledge, and modus operandi," *id.*, because "preparation," "plan," and "modus operandi" evidence served to identify the perpetrators of a crime, and the identity of the perpetrator in the case at bar was not in issue. *Id.* at 645, 756 P.2d at 1042. In addition, "knowledge" evidence was not probative because Castro did not claim that the crime for which he was being tried was committed without knowledge. *Id.* The court went on to hold that the

incremental probative value of the evidence in question was not great. The trial court's allowance on the prosecution's case-in-chief of evidence likely to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge was an abuse of discretion. On balance, the potential for unfair prejudice being generated by the evidence was far greater than its value in establishing facts of consequence to the determination of the case.

*Id.* at 645–46, 756 P.2d at 1042 (internal quotation marks, citations and brackets omitted).

**9.** *See supra* note 5.

where the relationship is being offered as a possible explanation for [Girlfriend's] recantation at trial.

. . . .

. . . [T]he Court is going to suggest that the Court provide [the jury with] a cautionary or limiting instruction before the evidence is presented.

(Footnotes not in original). The family court agreed to add a provision to the jury instructions explaining that the jury was not to consider the testimony on prior acts in deciding Asuncion's guilt or innocence.

Asuncion's attorney stated that "we had an officer who testified as to excited utterances, as well as two other juvenile witnesses, and so I don't think the need for this evidence is as great as would be normally argued." The State countered:

Neither the police officer, [Daughter] . . . nor [Son] . . . have been able to testify to . . . the context of the relationship that these people live with, and for that reason, it should be admitted notwithstanding the testimony of the other three witnesses that [sic] have testified before the Court.

The family court decided that

the evidence is being provided for a limited purpose under *Clark,* and in terms of the [HRE] 403 balancing, the Court does find that while I would agree that it's not very great because we have the testimony of the two children, nevertheless I think it's greater than the prejudicial impact.

The Court does not find that the evidence will arouse the jury to overmastering hostility, particularly in . . . light of the cautionary instruction that's gonna be given . . . and therefore, outweighing anything else that anyone else might testify to in this case.

The trial reconvened, and the family court instructed the jury:

[Y]ou're about to hear evidence which is being admitted by the Court for a limited purpose. The jury is not to consider this evidence in deciding the innocence or guilt . . . of the defendant.

The evidence is being allowed to provide you with the context of the relationship between the complaining witness and the defendant and to give you a possible explanation for the complaining witness' [sic] differing testimony in court this morning.

The family court repeated the instructions, and then the direct examination of Girlfriend resumed.

Girlfriend testified she did not remember an event that occurred on April 16, 1997, such as "getting hit in the head five times by [Asuncion] while he pull[ed] [her] to the ground," or that she filed a police report on that date. Girlfriend did remember there was an incident on December 4, 2000 and she had filed a police report on that date, but she did not remember exactly everything that happened. When asked if she remembered reporting that Asuncion had beaten her up; had grabbed her by the neck and the throat area, causing red bruises to the left and right side of her neck; and had pulled her hair in front of her kids, Girlfriend stated she remembered that night, her kids were not there as they were asleep, and it was just Asuncion and her.

Girlfriend testified she also remembered that she and Asuncion had argued on December 10, 2000 when she had gone to Asuncion's mother's house. Asuncion had hit her in the head and squeezed her mouth, and they were hitting each other.

Girlfriend testified that "there are days that I do hit him and he don't hit me and that's the truth." Girlfriend continued, "I provoke him and . . . I hit him too. I got myself too." She testified that she is "always depressed and angry." She and Asuncion would argue, and she would get mad at him. She would still be mad at him when the police came and would sometimes tell the police things to get Asuncion into trouble.

When questioned by Asuncion's attorney regarding the physical altercation, Girlfriend responded that she "yanked [Asuncion's] hair back and then I put my arm around his neck" and "I don't know if he went punch or push my head like that, but he tried to pry me off of his body." Girlfriend testified she "was hitting him to stay and not leave," but Asuncion would push her away every time she went near him. Girlfriend pulled his hair again as he was trying to leave.

Girlfriend testified that after Asuncion punched her, she picked up a pair of scissors and threatened Asuncion with the scissors, but then Son took the scissors from her.

Asuncion's attorney questioned Girlfriend about the statement she made to the police:

Q [DEFENSE COUNSEL] Okay. Now, [Girlfriend], you did say that you filled out this written statement, correct, for the police?

A [GIRLFRIEND] Yeah.

. . . .

Q Okay. And now you're saying that basically what this says isn't entirely true then?

A I never write down word for word what happened, everything what happened. The cops just told me to write. He was telling me what to write, the officer.

Q Oh, I'm sorry, the officer told you what to write?

A Yeah, he told—he asked me, he just said to write that that he [Asuncion] punched me in the head, that I would prosecute it cause I didn't wanna write it.

Q Okay. So, the part where you say that my boyfriend, Jonathan Asuncion, punched the right side temple and punched my left cheek, that's not true. I mean, he may have contacted those areas, but you don't think he, it's not as you make this sound that he punched you?

A No, cause I neva write everything from the beginning.

Q Alright. So, what you actually mean is that he was trying to push you away?

A Yeah.

. . . .

Q Okay. So this [statement] isn't entirely true, then, correct?

A No.

Q Okay. You know, is it safe to say that you wrote this stuff because at the time you were mad at [Asuncion]?

A Yeah.

In her testimony, Girlfriend stated she knew Son had filled out a statement for the police indicating that she had been punched twice. She did not tell Son or Daughter what to say. Girlfriend testified that Son and Daughter were outside on the porch and she saw Son when he walked in and grabbed the scissors from her.

The State questioned Girlfriend a second time about the physical altercation:

Q [PROSECUTOR] When did you pick up the scissors, was it before he punched you or after he punched you?

A [GIRLFRIEND] After I had him by his hair and the neck, then he pushed me away, then I reached for the scissors.

Q And when you say pushed, that's when you got punched in the face, right?

A Yeah.

Q Okay. So, then you got the scissors after you were punched?

A Yeah, and then I went grab the scissors and my son grabbed it from me.

Q Okay. So, you were punched in the face?

A I don't know if it was a punch or a push cause I was, I had my hand around his neck, and all I remember is him, like tugging away from me and I reached for the scissors.

Q And do you recall—did you have any injuries after you were punched in the face?

A No.

After Girlfriend's testimony, Asuncion moved for a judgment of acquittal, but the family court denied the motion.

Regarding the evidence of Asuncion's prior acts of domestic violence, the family court gave the following instruction to the jury: "Instruction Number 5: during the trial, I told you that certain evidence was allowed into this trial for a particular and limited purpose. When you consider that evidence, you must limit your consideration to that purpose."

The jury found Asuncion guilty as charged. Judgment was entered on January 14, 2004, and Asuncion timely appealed.

## II.

### A. Evidentiary Rulings

■ "We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz,* 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

### B. Abuse of Discretion

■ "Generally, to constitute an abuse, it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Crisostomo,* 94 Hawai'i 282, 287, 12 P.3d 873, 878 (2000) (internal quotation marks, citations, and brackets omitted).

## III.

Asuncion claims the family court prejudicially erred by admitting evidence of his prior acts of domestic violence against Girlfriend because that evidence was irrelevant and inadmissible under HRE Rule 404(b) and unnecessary and unduly prejudicial under HRE Rule 403.

### A. Girlfriend's recantation

■ In support of his argument, Asuncion maintains that admission of his prior bad acts was improper because Girlfriend's testimony did not actually amount to a recantation. Asuncion contends that, unlike the complaining witnesses in *Clark* and a case the Hawai'i Supreme Court cited in *Clark,*[10] Girlfriend did not clearly recant. Asuncion argues that Girlfriend "did not clearly and unequivocally withdraw her initial allegations" at trial, but, instead, "presented the full picture of what really happened during the altercation."

To "recant," according to *Black's Law Dictionary* 1274 (7th ed.1999), is "[t]o withdraw or renounce (prior statements or testimony) formally or publicly."

Girlfriend did recant the portion of her statement to the police that read: "I felt pain on both side [sic] of my face and head." She testified at trial that the hit to her head did not cause her any pain until the day after the incident took place and she did not feel pain when the police were at her apartment. Moreover, she clearly recanted (1) when she answered "No, I neva—he asked me if I felt pain, and he told me to write that I had pain" in answer to the question "And do you remember telling the officer that you felt pain on both sides of your face and neck?"; and (2) then again when she answered the question, "But you did feel pain?" with "No, at the time I was angry."

Asuncion suggests that in order for Girlfriend's testimony to rise to the level of a recantation, she had to have testified at trial that her "initial allegations had been completely false," or "expressly [said] that her earlier description was not true." However, one of the two primary cases on this point that the Hawai'i Supreme Court relied on in *Clark* indicates this is not so.

In *Smith v. State,* 669 A.2d 1 (Del.1995), the complaining witness had written in her statement to the police that she and her fiancé, Smith, had been arguing and Smith had hit her with his fists and forced her to have sexual intercourse with him. *Id.* at 3. Later, at Smith's trial, the complaining witness "reluctantly acknowledged that she and Smith had fought on the night in question and that they had traded punches. However, she denied having been raped." *Id.* The complaining witness explained that "when she spoke to the police ... she was angry, tired and upset." *Id.* She testified that "she exaggerated a lot about what had happened because she wanted the police to remove Smith from the apartment." *Id.*

---

10. The Hawai'i Supreme Court in *Clark* cites to *State v. Thompson,* 520 N.W.2d 468 (Minn.Ct. App.1994), a case in which the complaining witness told numerous persons, including her roommate, her sister, two police officers, and a domestic abuse counselor, that her boyfriend, Thompson, had sexually assaulted her with a

hanger. *Id.* at 470. However, soon afterwards, she told her sister that she had lied about the assault, she had used the hanger on herself, and she did not want Thompson to go to prison because of her false allegations. *Id.* The state proceeded to prosecute Thompson, and a jury later found Thompson guilty. *Id.*

The state sought to admit evidence relating to prior violent episodes between Smith and complaining witness. *Id.* at 5 The state argued that the fact the complaining witness was enduring an abusive relationship helped explain why she recanted her prior statement and testified the sexual relations were consensual. *Id.* The trial judge agreed and allowed the state to ask the complaining witness about the prior incidents. *Id.*

Nothing in the *Smith* opinion suggests the complaining witness specifically testified that her "initial allegations had been completely false" or that she "expressly [said] that her earlier description was not true," and, yet, the court agreed she had recanted at trial. *Id.* at 5.

Girlfriend's recantation of her statement to the police that she "felt pain on both side [sic] of my face and head" was critical to the State's prosecution. To convict Asuncion of Abuse of Family or Household Members, the State was required to prove beyond a reasonable doubt that Asuncion in striking Girlfriend caused her to suffer physical pain. Jury instructions numbers 14 and 15 read:

Instruction Number 14: in the complaint, the defendant, Jonathan Asuncion, is charged with the offense of abuse of family and [sic] household members. A person commits the offense of abuse of family and [sic] household members if he intentionally, knowingly or recklessly physically abuses a family or household member[ ].

There are two material elements to the charge of abuse of family and [sic] household members each of which the prosecution must prove beyond a reasonable doubt. These two elements are: one, on or about January 27, 2003, in the City and County of Honolulu, State of Hawaii, Jonathan Asuncion *physically abused* [Girlfriend]; and two, that at the time, Jonathan Asuncion and [Girlfriend] were either family or household members. The prosecution must prove beyond a reasonable doubt that the defendant acted intentionally, knowingly or recklessly as to each element of the offense.

Instruction Number 15: family or household members means spouses or persons who have a child in common, parents, children, and persons jointly residing or formerly residing in the same dwelling unit.

*Physical abuse means causing bodily injury* to another person. *Bodily injury means physical pain,* illness or any impairment of physical condition.

(Emphasis added.)

In *State v. Nomura,* 79 Hawai'i 413, 903 P.2d 718 (App.1995), this court approved of such a jury instruction defining "physical abuse" under HRS § 709–906(1) as "causing bodily injury to another person," meaning, in part, "physical pain." *Nomura,* 79 Hawai'i at 415–16, 903 P.2d at 720–21. As this court stated, "it is evident that to 'physically abuse' someone means to maltreat in such a manner as to *cause* injury, *hurt,* or damage to the person's body." *Id.* at 416, 903 P.2d at 721 (emphasis added).

The circuit court did not err by finding that Girlfriend's testimony at trial amounted to a recantation of her written statement given to the police.

**B. Prior recantation, expert witness, and explanation to jury**

■ Asuncion argues that even if the testimony did amount to a recantation, the State failed to establish the relevance of the prior acts because it did not: (1) offer proof of recantation in the prior instances, (2) provide testimony from an expert on domestic violence, or (3) otherwise attempt to clarify to the jury how three instances over a seven-year period could provide an explanation for the recantation.

In *Clark,* the complaining witness had recanted her statement to the police in one of the two prior incidents introduced into evidence at trial. *Clark,* 83 Hawai'i at 293, 926 P.2d at 198. However, the Hawai'i Supreme Court in *Clark* did not say the prior recantation was essential to its holding.

In addition, in *Thompson,* the prior bad acts introduced into evidence by the state did not include any prior recantations by the complaining witness. *Thompson,* 520 N.W.2d at 470–71. Likewise, in *Smith,* although the state was allowed to ask the complaining witness about five prior inci-

dents in which the defendant's conduct had resulted in the complaining witness calling the police, going to a hospital emergency room for treatment, or both, the incidents apparently did not involve recantations on the part of the complaining witness. *Smith,* 669 A.2d at 5.

█ Asuncion's contention that an expert on domestic violence was required to testify during the trial in order for his prior bad acts to be introduced into evidence also lacks merit. Nowhere in *Clark* does the court suggest that this is so, and in neither *Smith* nor *Thompson* did the trial include testimony by an expert witness.

█ As for whether the family court was required to explain to the jury how Asuncion's prior bad acts related to Girlfriend's in-court recantation, there is nothing in *Clark* or the record in the instant case to show that such an instruction was necessary. Regardless, the family court did explain to the jury, "[t]he evidence is being allowed to provide you with the context of the relationship between the complaining witness and the defendant and to give you a possible explanation for the complaining witness' [sic] differing testimony in court this morning."

## C. Prejudicial impact versus probative value of the evidence

█ Finally, Asuncion argues that, even assuming the evidence of the three prior incidents was relevant under HRE 404(b) and the holding in *Clark*, the family court erred by admitting the evidence because its prejudicial impact substantially outweighed its probative value.

After hearing the parties' arguments regarding the admission of the prior bad acts evidence, the family court explained that the prior violent incidents were

being provided for a limited purpose under *Clark*, and in terms of the 403 balancing, the Court does find that while I would agree that it's not very great because we have the testimony of the two children, nevertheless I think it's greater than the prejudicial impact.

The Court does not find that the evidence will arouse the jury to overmaster-

ing hostility, particularly in ... light of the cautionary instruction that's gonna be given ... and therefore, outweighing anything else that anyone else might testify to in this case.

The court then instructed the jury:

[Y]ou're about to hear evidence which is being admitted by the Court for a limited purpose. The jury is not to consider this evidence in deciding the innocence or guilt ... of the defendant.

The evidence is being allowed to provide you with the context of the relationship between the complaining witness and the defendant and to give you a possible explanation for the complaining witness' [sic] differing testimony in court this morning.

Later, while instructing the jury, the family court reminded the jury that "during the trial, I told you that certain evidence was allowed into this trial for a particular and limited purpose. When you consider that evidence, you must limit your consideration to that purpose."

█ "The responsibility for maintaining the delicate balance between probative value and prejudicial effect lies largely within the discretion of the trial court." *State v. Brantley,* 84 Hawai'i 112, 118, 929 P.2d 1362, 1368 (App.1996) (citing *State v. Iaukea,* 56 Haw. 343, 349, 537 P.2d 724, 729 (1975)).

In *Clark,* the supreme court held that the complaining witness's testimony regarding Clark's prior instances of violence "far outweighs any prejudice that may result as a consequence of introducing this evidence." 83 Hawai'i at 303, 926 P.2d at 208. In reaching this decision, the court noted that

*Castro* ... underscores the importance of the need factor when weighing probative value versus prejudicial effect under Rule 404(b). The *Castro* court's emphasis on the need for the evidence warrants the admission of the evidence at issue in the present case. Here, the incidents of Clark's prior violence and Diana's [the complaining witness] behavior were admissible to show the trier of fact Diana's relationship with Clark, where that rela-

tionship was offered to explain a central fact of consequence—Diana's recantation. *Id.* (internal quotation marks, citation, and footnote omitted).

In the instant case, pursuant to *Clark*, the State introduced into evidence prior instances of violence between Asuncion and Girlfriend to help explain why Girlfriend recanted at trial her statement to the police. As in *Clark*, the evidence of prior violence between Girlfriend and Asuncion was needed because it provided context for their relationship, whereas no other evidence in the trial did.

Additionally, the family court alleviated the risk of prejudice by specifically instructing the jury not to consider the prior instances of violence in determining Asuncion's guilt or innocence.

Therefore, we conclude the family court did not err by finding the probative value of the evidence outweighed its prejudicial effect.

### IV.

The Judgment of Conviction and Sentence filed on January 14, 2004 in the Family Court of the First Circuit is affirmed.